IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 2012 Session

**JERRY RAY DAVIDSON v. STATE OF TENNESSEE**

**Circuit Court for Dickson County**
**No. CR-7386   Robert E. Burch, Judge**

**No. M2010-02663-CCA-R3-PD - Filed  February 7, 2013**

The Dickson County Circuit Court denied the Petitioner, Jerry Ray Davidson, post-conviction relief from his convictions of first degree premeditated murder and aggravated kidnapping and his sentence of death.  The Petitioner appeals.  Having discerned no error, we affirm the post conviction court's denial of relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and JEFFREY S. BIVINS, JJ., joined.

Paul J. Morrow, Jr., and Kelly A. Gleason, Office of the Post-Conviction Defender, Nashville, Tennessee, for the Petitioner, Jerry Ray Davidson

Robert E. Cooper, Jr., Attorney General and Reporter, William E. Young, Solicitor General, and Scott C. Sutherland, Assistant Attorney General; Dan Alsobrooks, District Attorney General and Robert S. Wilson, Assistant District Attorney General, for the Respondent, State of Tennessee

**OPINION**

**Background**

The Petitioner, who was fifty-two years old at the time of trial in 1997, was convicted of first degree premeditated murder and aggravated kidnapping.  The convictions relate to the 1995 murder and kidnapping of Virginia Jackson in Dickson County.  The Petitioner received the death penalty for the murder conviction and a twenty-year sentence for the kidnapping conviction.  The jury sentenced the Petitioner to death based upon its finding of the following three aggravating circumstances:  (1) the Petitioner was previously convicted

of one or more felonies whose statutory elements involve the use of violence to the person; (2) the murder was knowingly committed by the Petitioner during the commission of a kidnapping; and (3) the Petitioner knowingly mutilated the body of the victim after death. *See* Tenn. Code Ann. § 39–13–204(i)(2), (7) and (13) (Supp. 1995). The facts of this case were summarized by our supreme court in its opinion on direct appeal:

[Guilt Phase]

Between 8 and 9 p.m. on September 26, 1995, the victim, Virginia Jackson, and her dog arrived in a taxi cab at Bronco's Bar in Dickson, Tennessee. Jackson was carrying a large purse and a white bed pillow and wearing multicolored hair clips. When Jackson arrived at Bronco's Bar, the defendant, Jerry Ray Davidson, was sitting quietly by himself drinking beer. Jackson spent the next several hours at the bar drinking two beers and talking with the bartender, Carol Owens, and other bar patrons. Although Jackson and Davidson sat next to one another at one point, the two did not converse, and the evidence does not suggest that they were acquainted. By closing time, only Jackson, Davidson, and Owens remained in the bar. Owens tried to call a cab for Jackson, but the cab company was closed for the night. Jackson accepted a ride home from Davidson and was last seen alive around 11:30 p.m., carrying her purse and pillow as she got into Davidson's red pickup truck with her dog.

Members of Jackson's family became worried when they did not hear from her for several days. On October 1, 1995, her family filed a missing person report with law enforcement officials, who began an investigation of her disappearance. [FN: Jackson's dog was found at her home.]

On September 30, 1995, only a few days after Jackson was last seen, Jackson's brother-in-law observed a pile of clothing lying along a farm road leading to her house. At that time, he did not connect the clothing with her disappearance. On October 18, however, he reported the clothing to law enforcement authorities. On October 18 and 19, law enforcement officers found the following items belonging to Jackson along the farm road: hair clips, a cell phone, panties, a pillow, a sweatshirt, and a sock. On October 19, 1995, two deer hunters found Jackson's decomposing, nude body. The body was partially buried in a shallow grave several miles from her house in a wooded area off an old logging road along the Houston/Dickson County line.

At trial, the condition of Jackson's body was described by Dr. Murray Marks, the forensic anthropologist who disinterred the body, and by Dr. Charles

2

Harlan, the forensic pathologist who performed the autopsy on the body. Dr. Marks stated that the body was found lying chest down. The head was missing, although it appeared that a space had originally been dug for it in the grave. Part of the torso and left arm of the body were exposed, and the left hand was missing. There was evidence that animals had gnawed on the left arm, the neck, and the shoulder area. However, other trauma to the body was inconsistent with animal activity. Dr. Harlan observed that the skin at the front and back of the neck had been cut; the trachea exhibited a clean, sharp cut; the hyoid bone, which is located in the upper throat, had also been cut; and there was clear disarticulation of the cervical vertebral column. In addition, the torso, including the breast bone, had been cleanly cut open with some type of sharp instrument. This incision ran almost the entire length of the torso from the sternum to the navel and exposed the internal organs. Several superficial cuts had been made in the soft tissue next to the large incision. Dr. Harlan opined that both the major incision and the lesser cuts were inflicted after death. Toxicology tests revealed the presence of alcohol and Prozac in the body, although the quantity of these substances was not determined. According to Dr. Marks, it was possible that Jackson's neck had been cut and her head removed after death by either animal or human activity. Dr. Harlan opined that a human being, not an animal, had removed the head after death. Relying on changes in the body's color and texture, Dr. Marks concluded that Jackson had been dead for four to six weeks. Based on the degree of the body's decomposition, Dr. Harlan testified that death had probably occurred within twenty-four hours of Jackson's departure from Bronco's Bar on September 26, 1995. A cause of death could not be determined from Jackson's remains. Dr. Harlan, however, expressed his belief that her death was a result of homicide and that she could have died from wounds to her neck or head.

All of the evidence regarding Davidson's role in the killing is circumstantial. For example, Davidson was a janitor in a hospital department where surgical instruments were cleaned. Although he had been a good and reliable employee, he did not return to work as scheduled after September 26, 1995. He did not contact anyone at work about his absence, and he was eventually fired. In addition, he did not return to his residence at his mother's home for almost three weeks after Jackson's disappearance. On October 2, 1995, Davidson's mother informed the Dickson police that he was missing. Mrs. Davidson withdrew the missing person report on October 8, 1995, after Davidson telephoned her. Davidson later returned to his mother's house, once spending the night, and a second time retrieving a camper top for his pickup truck.

3

There was also evidence that Davidson was in the area where the body was found in the days following Jackson's disappearance. Between October 4 and 6, 1995, approximately a week after Jackson disappeared, Melinda Jones saw Davidson driving a red truck very slowly down Old Yellow Creek Road in Dickson County. Jones saw an object in the passenger seat that was tightly wrapped in a white sheet and was about as high as Davidson's shoulder. As the truck went by, Jones saw the white object fall over onto Davidson, who pushed it away. Later that evening, Jones observed the same truck traveling in the opposite direction at a high rate of speed. Jones also testified that she remembered seeing the same truck go down the road a few days to a week earlier, shortly after Jackson disappeared. At that time, the truck was going very slowly, and Jones, who was able to see inside the vehicle as it passed, noticed that "there was something that wasn't right about the passenger's seat." Jackson's body was discovered about one and a half miles from Jones's home.

Additionally, between October 2 and 6, 1995, around 8 to 9 a.m., Davidson came into Kim's One Stop Market not far from Jones's home. He was wearing work pants and was covered with dirt to his waist. According to one witness, Davidson looked "like he'd been digging in like a garden or something." Davidson sat in the store drinking a cup of coffee for about an hour before driving away in a red pickup truck with a camper top. A week later he returned to the market to purchase a soft drink.

The State's proof also showed that on September 29 and 30, 1995, Davidson made purchases at a grocery store and at a Wal–Mart in Waverly, Tennessee, in the county just southwest of the area where Jackson's body was found. On October 4, 1995, around the time Melinda Jones saw Davidson driving his truck down Old Yellow Creek Road, Davidson also made a withdrawal from an automatic teller at a bank in Erin, Tennessee, in Houston County. All of these transactions place Davidson in the vicinity where Jackson's body was found at a time shortly after her disappearance.

Other sightings of Davidson after Jackson's disappearance also connect him with the killing. For example, on October 9, 1995, Davidson reappeared at Bronco's Bar in Dickson. When Owens, the bartender, asked him where he had taken Jackson on September 26, 1995, Davidson told her that he had dropped Jackson off at a Kroger grocery store. Later that same day, when Timothy Eads of the Dickson County Sheriff's Department went to Bronco's Bar to speak with Owens, Davidson was still there. After Owens identified

4

Davidson as the man who had taken Jackson home, Eads questioned Davidson about Jackson for several minutes. Davidson informed Eads that he had left Jackson at the Kroger parking lot around midnight. Davidson appeared nervous and uncomfortable during his conversation with Eads and left the bar soon after Eads. When Eads tried to contact Davidson again, Davidson could not be located. On October 18, 1995, Eads executed a search warrant at Davidson's residence. He seized an expended 20–gauge shotgun shell that was later determined to have been fired from a shotgun found in Davidson's truck.

On October 12, 1995, Davidson came into the Lakeview Tavern in Cumberland City and ordered a beer. The bartender, Darla Harvey, testified that his pants and shoes were covered with dirt. For over an hour, Davidson sat in the bar and stared at Harvey while sipping his beer. Disturbed by Davidson's appearance and behavior, Harvey went outside and examined Davidson's truck. At that time, the bed of the truck was covered with a camper top that had been spray painted red everywhere but the back window. Harvey looked inside the camper and saw a dirty sleeping bag, a dirty shovel, a chain, and two Rubbermaid containers. According to Harvey, the truck was "very messy," as if Davidson had been living in it. Harvey informed some of the bar patrons that she was afraid of Davidson, who then left the bar at the patrons' request.

On October 19, 1995, Davidson was arrested at Robert's Creek Bar near Cuba Landing in Humphreys County. At the time of the arrest, Investigator Ted Tarpley spoke with Davidson. Davidson denied giving Jackson a ride on September 26. After Officer Eads joined the interrogation, Davidson changed his story and stated that he had left Jackson at the Kroger parking lot before driving to Nashville. He claimed that he stayed in Nashville until 3 or 4 a.m., returned home, and then left the next morning for East Tennessee. Eads and Tarpley did not inform Davidson that Jackson's body had been found. When asked to hypothesize about what might have happened to Jackson, Davidson responded, "Maybe somebody got her and chained her to a tree." Davidson also told Eads and Tarpley that they might find Jackson with her head and hands missing to keep anyone from identifying the body. After Davidson was informed that the body had been found, he was asked what he had done with the head, and he replied, "I haven't told you that I killed her yet." Davidson later said that he might have something to say but could not say it yet. He also told the officers that he had quit his job because "things were just getting tense" and he decided to leave.

5

Searches of Davidson, his truck, and the area where the body was discovered yielded several items linking him to the killing. On his person, the arresting officers found a .25 caliber automatic pistol, a chrome knuckle knife with the blade open, a pair of handcuffs, a box of .25 caliber bullets, and a live 20–gauge shell. The pistol was loaded and ready to fire. At the time of his arrest, Davidson's truck did not have a camper top on it. His truck appeared to have been driven through mud and vegetation. Moreover, the truck contained the following items: an Ozark Trails tent, two shotguns, a knife, handcuff keys, clothing, flashlights, cans of red spray paint, and Marlboro cigarettes. Officers also found numerous items at the campsite or grave site that belonged to either the defendant or to Jackson. [FN: For purposes of investigation, the general location where the body and other evidence was found was broken down into two areas: the grave site area where the body was actually found and the campsite area across the logging road from the grave.] The items included a box for an Ozark Trails tent, shells that had been fired from the shotgun found in Davidson's truck, a knife, handcuffs that matched the keys discovered in the Davidson's truck, packages and fragments of Marlboro cigarettes, a tool box resembling one previously seen on Davidson's truck, cans of red spray paint, clothing and flashlights similar to those in Davidson's truck, and two receipts reflecting a withdrawal from Davidson's bank account on October 4, 1995, at an automatic teller in Erin, Tennessee. Personal items belonging to Jackson, such as her sandals, billfold, a hair clip, a brush, a prescription bottle, and cigarette case, were found at the campsite as well.

In addition, the bottom of the passenger seat in Davidson's truck had been cut out. A chain and padlock found around the passenger seat were arranged in such a manner that they could be used to restrain a passenger. Blood on the passenger seat and head rest tested positive for human blood. DNA testing indicated that the blood samples from the truck did not match Davidson's DNA. Instead, the samples were consistent with Jackson's DNA. According to a report from LabCorp, Inc., only one in 265,000 people would be expected to have DNA matching that of Jackson.

The defense presented evidence attempting to counter the prosecution's circumstantial evidence. There was testimony that two tires on Jackson's truck had been punctured by a knife about two days before she disappeared. In addition, a forensic pathologist who testified for the defense criticized the manner in which the State's forensic pathologist had performed the autopsy and preserved the body. The defense pathologist also complained that the

6

quantity of alcohol and Prozac in Jackson's body should have been determined. The defense introduced Jackson's medical records reflecting her hospitalizations between 1978 and 1995 for depression and drug and alcohol abuse in an attempt to show that Jackson might have died from an overdose of alcohol and/or Prozac. Her medical records include a report that she had once overdosed on the drug Soma and had been pronounced dead. In addition, a bottle labeled for a prescription for thirty pills of Prozac dispensed on September 25, 1995, contained only five tablets when found at Jackson's home after her disappearance. To counter the inference that Davidson could have used a surgical instrument from his workplace to cut Jackson's body, the defense presented testimony that no surgical instruments had been reported missing from Davidson's place of employment. Finally, the defense presented the testimony of a DNA expert who was unable to corroborate the findings of the State's experts. The expert challenged the opinion that the DNA test ruled out Davidson as the source of the blood found on the passenger seat of his truck. The defense expert admitted, however, that she had made no independent examination or analysis and was only reviewing LabCorp, Inc.'s findings.

[Penalty Phase]

During the sentencing phase, the State presented proof that Davidson had been convicted in 1971 for assault and battery with the intent to commit rape, in 1976 for assault and battery with the intent to ravish and to have unlawful carnal knowledge of a female over 12 years of age, and in 1983 for felonious crime against nature and for felonious sexual battery. A Tennessee Bureau of Investigation agent testified that Jackson's body had been mutilated by cutting the neck area and torso. Photographs showing the mutilation were re-introduced.

In mitigation, the defense presented the testimony of Davidson's mother, several of his co-workers, and his minister. Davidson's mother related that, as a child, he had lived with his grandparents and had not completed school because he was always in trouble with the law. She described her son as a quiet boy who had few friends. He had no contact with his father throughout his life. At some indefinite time in the past, he had spent one to two years at Central State Hospital for mental problems. Davidson's mother testified about how badly Davidson had taken his younger brother's death in Vietnam and how he had helped her at home. Next, several of Davidson's co-workers testified that he was a good worker, a good friend, and a nice, considerate man who would help anyone. They found Davidson's involvement in Jackson's

murder inconsistent with his behavior when he was around them. The last witness for the defense was Joe Ingle, a minister, who described Davidson as quiet and passive, with an interest in the Bible's prophetic books and an openness to learning new things. Ingle opined that Davidson would not be a threat in prison and would participate in work or educational programs.

*State v. Davidson*, 121 S.W.3d 600, 605-10 (Tenn. 2003). The supreme court affirmed the Petitioner's convictions and sentences in a three to two opinion. The two dissenting justices opined that the evidence was insufficient to support a finding of premeditation and also that the admission of the testimony of Darla Harvey was reversible error because it was irrelevant, unfairly prejudicial, and improper lay opinion.

## Post-Conviction

The Petitioner timely filed his petition for post-conviction relief in August 2004. The trial court appointed the Office of the Post-Conviction Defender which filed an amended petition in March 2005. The trial court conducted an evidentiary hearing over the course of several days in May and November 2006, September 2008, and March 2009. On November 10, 2010, the trial court filed its written order denying post-conviction relief.

## Evidentiary Hearing

Tina Smith, an employee at the hotel where the jurors were sequestered during trial, testified on behalf of the Petitioner. Ms. Smith witnessed a red car with a driver and a passenger circle the hotel while the jurors were having dinner in the hotel restaurant. She witnessed the passenger exit the car, walk down the corridor where the juror rooms were located, then return to the car, at which time the two individuals drove away. Ms. Smith stated that the passenger did not encounter anyone during his walk. Ms. Smith reported the incident, which she described as unusual, to one of the officers accompanying the jurors. Ms. Smith did not recognize either the driver or passenger, and according to her testimony, the jurors would not have been able to see the passenger exit the car and walk down the corridor from their vantage point in the restaurant. Ms. Smith testified that she did not witness any juror come into contact with the individual from the vehicle.

Rosemary Jackson served on the jury in this case. Although Ms. Jackson did not see trial counsel visit the hotel, she testified that "everybody was talking about it." Ms. Jackson also testified that after the jury was empaneled she heard one of the bailiffs tell some of the jurors that the Petitioner had beheaded the victim and "had done really bad things to other people." In addition, Ms. Jackson testified that her husband worked at the jail where the Petitioner was housed during trial. Her husband told her he thought the Petitioner was guilty

8

and also told her that the Petitioner mentioned that if he was found guilty he would kill anyone in order to escape. During cross-examination, Ms. Jackson confirmed that she maintained no predisposition about the Petitioner's guilt or innocence.

In addition, one of the police officers called to investigate the incident at the hotel testified about the report he prepared. Dan Alsobrooks, the District Attorney General involved in the prosecution of this case, testified that he was aware the trial judge issued an order prohibiting such conduct in the future but did not know of any specific crime committed by trial counsel which would have required an independent investigation by his office.

Ralph Easley taught the Petitioner in 1966 at the State Area Vocational Technical School in Dickson. Mr. Easley taught electronics and remembered the Petitioner as having been an average student. According to Mr. Easley, the Petitioner was a fairly normal individual and never caused any trouble. During cross-examination, though, Mr. Easley could not confirm that the Petitioner was the same Jerry Davidson he taught in 1966.

Sheila Renee Elsea testified that the Petitioner was a regular customer at a restaurant where she worked. Ms. Elsea also stated that the Petitioner was a friend of her ex-husband's grandmother. According to Ms. Elsea, the Petitioner frequented her ex-husband's family Sunday dinner between the mid 1980's into the early 1990's. Ms. Elsea recalled that the Petitioner acted normal at the restaurant and during the Sunday dinner visits. Though she did not remember the Petitioner's being a talkative person, Ms. Elsea testified that the Petitioner was polite and never caused any trouble. Ms. Elsea also knew the victim in this case.

Bill Sensing was a childhood friend of the Petitioner's younger brother, who later died in the Vietnam War. Mr. Sensing testified that he spent little time around the Petitioner but he did not remember the Petitioner's having many friends. Mr. Sensing described the Petitioner as "an odd person," the same description he gave the Petitioner's mother who Mr. Sensing said would allow her children to come and go as they pleased. Mr. Sensing did not recall the Petitioner's mother ever showing any affection toward the Petitioner. Mr. Sensing admitted during cross-examination though that he never visited the Petitioner's house. Mr. Sensing testified that he never witnessed the Petitioner act violently as a child. Mr. Sensing stated that, prior to the evidentiary hearing, he had not seen the Petitioner since the Petitioner was eight or nine years old.

Collier Goodlett, Assistant Public Defender, and Attorney Michael Love represented the Petitioner at trial. Counsel were appointed on June 5, 1996, and the trial commenced on August 4, 1997. Mr. Goodlett had handled two prior death penalty cases and served as lead counsel in this case. During the time he represented the Petitioner in this case, Mr. Goodlett

testified that he maintained an extremely heavy caseload, which included representing another defendant facing the death penalty. Mr. Goodlett also testified that he had no secretarial help and thus was alone responsible for preparing and filing all pleadings.

According to Mr. Goodlett, the defense theory at trial was to challenge the sufficiency of the State's evidence. Mr. Goodlett did not believe the State would be able to prove its case for first degree murder beyond a reasonable doubt. As for sentencing, Mr. Goodlett testified that the defense focused on a theory of residual doubt and called several witnesses in an attempt to show that the Petitioner did not deserve to die. Mr. Goodlett spoke with the Petitioner's mother occasionally prior to trial but did not interview any other family members. Mr. Goodlett knew the Petitioner only completed the 9th grade in school, and he was aware of his criminal record. Mr. Goodlett was also aware of the Petitioner's extensive mental health history and acknowledged that he agreed that the Petitioner should be evaluated at Middle Tennessee Middle Health Institute (MTMHI) before trial.

Mr. Goodlett retained the services of Dr. Pamela Auble, a neuropsychologist, to evaluate the Petitioner prior to trial. Mr. Goodlett wanted to know whether counsel would be able to challenge the Petitioner's ability to form the requisite mental state for the crimes charged. Mr. Goodlett also hoped Dr. Auble's evaluation would reveal helpful mitigating evidence. Mr. Goodlett acknowledged, though, that he did not file a motion for funding for Dr. Auble until July 10, 1997, and that the trial court did not approve funding until July 14, 1997. Mr. Goodlett was asked to review Dr. Auble's report and confirmed that it discussed the Petitioner's poor upbringing, his father, who was an alcoholic and abusive, his mother, who was hostile toward men and thought sex was evil, that the Petitioner lived with his grandparents until age six, that he dropped out of school in the tenth grade, the Petitioner's long history of mental health problems for which he received treatment and medication, his alcohol and drug usage, his criminal record, and his issues with women. Dr. Auble concluded that the Petitioner suffered from an adjustment disorder with anxiety and a schizotypal personality disorder. Mr. Goodlett testified, however, that defense counsel decided not to call Dr. Auble as a witness during either phase of the trial.

Mr. Goodlett acknowledged that he had reviewed the Petitioner's records from MTMHI. The discharge summary from MTMHI reported that the Petitioner was diagnosed with alcohol dependancy and personality disorder not otherwise specified, including schizoid, antisocial and avoidant traits. The report also summarized the Petitioner's past psychiatric history: he was hospitalized at Central State (now MTMHI) when he was seventeen years old; had been prescribed psychotropic drugs in the mid 1960's; and had been in and out of jail most of his life. In addition, the Petitioner's intelligence was deemed to have been slightly below average and his insight and judgment were considered poor. A CT head scan of the Petitioner performed at MTMHI revealed mild atrophy, and an EEG test revealed some

10

abnormality "because of a slight excess of asynchronous slowing in all quadrants, which is a non-specific finding." Mr. Goodlett could not remember though whether Dr. Auble was provided with the Petitioner's MTMHI records. And although Mr. Goodlett knew the Petitioner had been incarcerated at the DeBerry Special Needs Facility, he did not recall obtaining those records or providing them to Dr. Auble.

Mr. Goodlett filed numerous pretrial motions related to the jury selection, aggravating circumstances, prosecutorial conduct, and suppression of the Petitioner's statements to the police. Mr. Goodlett acknowledged that he did not file a motion to strike the aggravating circumstance regarding the mutilation of the body but stated he probably should have. Mr. Goodlett agreed that counsel should have investigated more thoroughly the schizophrenic diagnosis the Petitioner originally received in the 1960's. Mr. Goodlett also agreed that they should have introduced more evidence during the hearing on the motion for change of venue in order to emphasize their position that the media coverage was extensive and that the victim's family was well-known by almost everyone in the community. Mr. Goodlett, however, did not remember why they waited until after the hearing on the motion for change of venue to request funding for a jury consultant.

Mr. Goodlett requested the services of Glori Shettles to assist counsel with the investigation and presentation of mitigating evidence for the penalty phase. Counsel filed the motion for funding on or about April 2, 1997, but the trial court did not sign the order authorizing those funds until June 2, 1997. Mr. Goodlett testified that Ms. Shettles expressed concern to defense counsel about her ability to conduct a thorough investigation into the Petitioner's background before the start of trial in August 1997. Mr. Goodlett stated that he did not file a motion for a continuance based solely upon Ms. Shettles' concerns. Although, on June 13, 1997, Mr. Goodlett did file a motion to continue the trial, which at that time was schedule to begin July 7, 1997.

Mr. Goodlett testified that prior to trial he intended to cross-examine Dr. Charles Harlan, the medical examiner who performed the autopsy in this case, regarding allegations that he had mishandled autopsies in other cases. Mr. Goodlett was aware that Dr. Harlan apparently lost or destroyed certain body parts of the victim in this case. Mr. Goodlett thus admitted that he should have filed a motion to dismiss, or at least requested a missing evidence instruction, because of Dr. Harlan's alleged conduct with respect to the handling of some of the evidence in this case.

Mr. Goodlett was questioned about numerous statements the prosecutor made during opening and closing arguments which he agreed were supposedly objectionable, but he could not explain why defense counsel did not object. Mr. Goodlett was also questioned about his conduct during voir dire and whether he should have objected to or otherwise requested

11

certain jury instructions. As to each instance, Mr. Goodlett did not have a reason for his actions or inactions related thereto.

Mr. Goodlett admitted that he and Mr. Love visited the hotel where the jury was sequestered to see if the newspaper boxes were located in an area accessible by any of the jurors. Mr. Goodlett testified that neither he nor Mr. Love exited the vehicle. Furthermore, Mr. Goodlett did not believe they were seen by any of the jurors. Mr. Goodlett did recall, though, that the trial judge later admonished them for going to the hotel.

During cross-examination, Mr. Goodlett estimated that he filed sixty or seventy pretrial motions in this case. In addition to the standard motions he filed in most cases, Mr. Goodlett testified that he filed other motions relating to "everything that [he] could think of." For example, Mr. Goodlett filed a request for permission to view the notes the trial judge took during voir dire because he thought they might have revealed names of jurors who were too eager to sit on this case. Similarly, Mr. Goodlett testified that he believed counsel took every appropriate step to get the trial moved to another county.

Mr. Goodlett acknowledged that counsel employed the services of several independent experts to assist the defense. Mr. Goodlett recalled that the defense presented expert testimony to challenge the State's DNA evidence. Mr. Goodlett also testified that he met with Dr. Harlan prior to trial to discuss his autopsy and thereafter obtained the services of an independent expert to challenge Dr. Harlan's conclusions. Mr. Goodlett stated that they voiced an objection because Dr. Harlan allegedly did not preserve all of the evidence following his autopsy thereby preventing their expert from examining all of the bones that Dr. Harlan examined. Mr. Goodlett retained the services of Dr. Auble to evaluate the Petitioner's mental health. Mr. Goodlett decided not to call Dr. Auble as a witness after she related her findings to him, however. According to Mr. Goodlett, Dr. Auble told him that the only contribution she could have made in defense was to testify that the Petitioner would be a good candidate for life in prison.

Mr. Goodlett agreed that the Petitioner had never been declared incompetent to stand trial or otherwise insane. Although Mr. Goodlett testified that he since believed counsel should have introduced evidence about the Petitioner's mental health during sentencing, he agreed that statements the Petitioner made, which are contained in his records, that he liked to rape women and that he wanted to chain a woman in his vehicle, would have been hurtful to the defense had the State been able to introduce them in rebuttal. When questioned further during cross-examination, Mr. Goodlett testified that he was concerned about the State's ability to rebut any psychological evidence with the negative information contained in the Petitioner's records. As such, Mr. Goodlett agreed the fact that the Petitioner was described in his records as manipulative and prone to lying had some bearing on his decision not to call

12

mental health experts during sentencing. The Petitioner's records also contained an expert opinion that the Petitioner would be inclined to commit rape and murder in the future, which Mr. Goodlett agreed would have been detrimental if introduced by the State in rebuttal. Also detrimemtal, Mr. Goodlett testified, were reports attributed to the Petitioner saying that one of his favorite activities was to rape women, that he had raped over one hundred women, and that he believed the only difference between making love and rape was whether or not the woman liked it.

Mr. Goodlett testified that counsel thoroughly investigated the facts of this case and discussed trial strategy with the Petitioner. According to Mr. Goodlett, their in-house investigator interviewed the State's witnesses and visited the crime scene. Mr. Goodlett testified that they introduced evidence relating to the victim's history of mental health treatments and substance abuse in an attempt to suggest she was somewhat irresponsible and could possibly have met someone else after she left the bar with the Petitioner. Mr. Goodlett testified that the Petitioner was aware of all the negative information contained in his records. Although counsel discussed with the Petitioner the possibility of testifying in his own defense at both stages of the trial, Mr. Goodlett did not believe the Petitioner would have made a good witness.

Glori Shettles, an employee of Inquisitor, Inc., was retained by trial counsel to investigate potential mitigating evidence in this case. Ms. Shettles stated she was initially contacted by counsel in November 1996. Ms. Shettles did not know, though, why counsel did not file a motion for her services until April 2, 1997. Nor did she know why the trial court's order authorizing her funding was not filed until June 2, 1997, or why counsel did not notify her until June 19, 1997. Ms. Shettles did not begin working on this case until funding was authorized, and she stated that she did not have any contact with counsel between April and June 1997.

According to Ms. Shettles, approximately nine months are required to adequately investigate and assess mitigating evidence in a capital case. Ms. Shettles testified, though, that she performed "very, very little" investigative work in this case. Ms. Shettles recounted telling counsel that she was concerned about the lack of time available between the funding authorization and trial date for her to conduct an adequate investigation. Ms. Shettles said she was asked to review the records counsel had already obtained and to interview the Petitioner, his mother ,and "a couple of collateral people." Ms. Shettles testified, though, that she received no further direction from counsel regarding the theory they intended to pursue at sentencing. Although she stated that she had available resources to perform a standard capital case mitigation investigation, Ms. Shettles stated she did not have the time to do so in this case. Ms. Shettles billed approximately forty hours of investigative work in this case.

13

During cross-examination, Ms. Shettles acknowledged that she reviewed records obtained by the Public Defender's in-house investigator. She further acknowledged that she highlighted the content of the records for counsel, including the unfavorable content counsel would likely have steered clear of during trial. Ms. Shettles testified that she had not been involved in many other cases where the records of the defendant were as unfavorable for defense counsel as in this case.

Rockelle (Daniels) Coffey was a criminal investigator for the Public Defender's Office during the trial of this case. Ms. Coffey identified a memo, dated June 25, 1997, which she wrote to Ms. Shettles, the mitigation specialist hired by defense counsel. Attached to that memo were all of the Petitioner's records Ms. Coffey had collected to date, including a copy of the records from the Petitioner's mental health evaluation at MTMHI in March 1997. Ms. Coffey did not interview any witnesses other than the Petitioner during her investigation into this case, but she acknowledged during cross-examination that her primary job was to identify and locate relevant records related to the Petitioner's history. Ms. Coffey testified that her involvement in this case ended once Ms. Shettles began her investigation.

Dr. Daniel Malcolm Spica, a neuropsychologist, evaluated the Petitioner prior to the evidentiary hearing in order to assess the Petitioner's neurobehavioral status. Dr. Spica interviewed the Petitioner in prison on two separate dates for a total of twelve hours. As part of his evaluation, Dr. Spica administered approximately twenty tests which measured the Petitioner's mood, his ability to receive and process information, and his academic performance, in addition to ascertaining whether the Petitioner was malingering. According to Dr. Spica, the Petitioner did not malinger during the interviews. Dr. Spica testified that the Petitioner seemed to function well during normal interaction and that he possessed a good vocabulary and was reasonably articulate. Dr. Spica determined that the Petitioner's full I.Q. was 89, which is between average and below-average. According to Dr. Spica, the Petitioner's verbal I.Q. score was 97, and his performance I.Q. score was 79. Although Dr. Spica stated that the verbal score reflected the Petitioner's good vocabulary and general accumulated knowledge, the eighteen point difference between the two individual I.Q. scores suggested probable brain dysfunction. Dr. Spica testified that the Petitioner had difficulty mentally organizing and comprehending information in uncertain or unfamiliar situations. Accordingly, Dr. Spica opined that the Petitioner would perform well in a structured environment such as prison.

Dr. Spica diagnosed the Petitioner with a cognitive disorder, not otherwise specified, due to impaired judgment and reasoning skills, impaired visual and analytical processing, impaired reading speed, dysfunction of executive controls, and impaired ability to discriminate information. Dr. Spica also diagnosed the Petitioner with depressive and anxiety disorders, not otherwise specified. According to Dr. Spica, the testing results

14

suggested that the Petitioner had frontal and right hemisphere cerebral dysfunction. Dr. Spica concluded that the Petitioner possessed "instability of reasoning (disordered thinking when under pressure)" and "deficits in discriminating between actual information and distorted approximations." Dr. Spica further concluded:

> [The Petitioner appeared] to be a man of only modest internal/intellectual resources, with unreliable judgment skills, and an inability to sort through information provided to him. His objective test scores revealed that his reasoning ability under calm, controlled conditions ranks at the level of a 9- or 10-year-old; when under pressure he performed much lower (severely impaired range). In addition, his apparent right hemisphere processing inefficiency likely leads him to misinterpret the array of subtle cues provided in social contexts that bring meaning to interpersonal interactions. The [Petitioner] is likely easily overwhelmed by multiple sources of information, ambiguous signals, and any perceived pressure/threat.

Dr. Spica testified that the consumption of alcohol would exaggerate the Petitioner's impairments.

Dr. Peter Irvin Brown, a psychiatrist, performed a forensic psychiatric evaluation of the Petitioner prior to the evidentiary hearing. Dr. Brown interviewed the Petitioner in prison on two separate dates for a total of approximately five hours. Dr. Brown relied upon Dr. Spica's report and also reviewed the report from Dr. Auble's evaluation of the Petitioner conducted prior to trial, as well as the MTMHI pretrial report and various other of the Petitioner's medical, mental health and prison records and social history.

According to Dr. Brown, one mental health report when the Petitioner was about seventeen years old suggested that he may have suffered from a pre-schizophrenic panic. Another psychiatric evaluation of the Petitioner when he was about twenty-seven years old concluded with a diagnosis of undifferentiated schizophrenia and revealed marked sexual maladjustment. Dr. Brown also noted a report when the Petitioner was thirty-five years of age describing the Petitioner as having an inadequate personality, lacking social skills, and being highly anxious, impulsive and suggestible. A report from the sexual offender program when the Petitioner was about thirty-eight years old concluded that he did not appear to have the psychological resources to effectively deal with an unsupervised placement in the community. Dr. Brown also referred to a report when the Petitioner was about forty-one years old which noted that, despite the Petitioner's extensive record, his problems with impulsiveness and evidence of antisocial tendencies were only moderate. Another report from a year later, when the Petitioner was about forty-two years old, described the Petitioner's unconventional thinking patterns and other schizoid features. Dr. Brown

15

testified that two later reports diagnosed the Petitioner with antisocial personality disorder. Having reviewed these records, Dr. Brown testified that "the heavy weight of the clinical evidence strongly supported the original concerns that [the Petitioner] is an individual who has a schizotypal personality" with "a chronic, probably life long condition that involves massive deficits in being able to communicate[,] to think and plan carefully and to control emotion and behavior." According to Dr. Brown, the Petitioner poses no risk as long as he remains in a structured environment like prison.

According to Dr. Brown, Dr. Spica's report revealed that the Petitioner's capacity to intake and process information is significantly impaired. Dr. Brown noted that the CT scan contained in the MTMHI report from 1997 revealed cerebral atrophy. Dr. Brown testified that people who suffer from schizophrenia are prone to shrinking of the brain tissue. In addition, an EEG from that same report showed further abnormality in the electrical activity in the Petitioner's brain which, according to Dr. Brown, is also common among schizophrenics. Dr. Brown agreed with Dr. Spica's assessment that the Petitioner's social and emotional capacities corresponds with that of a ten-year-old.

Dr. Brown diagnosed the Petitioner with cognitive disorder, not otherwise specified, and schizotypal personality disorder. Dr. Brown testified that the Petitioner exhibits signs of severe disordered thinking, difficulty regulating emotions, high anxiety and trouble with social communication. Dr. Brown noted a history of alcohol abuse but did not find any evidence of mental retardation. According to Dr. Brown, because of his impairments, the Petitioner cannot differentiate between what he imagines happening and what actually happens. Dr. Brown opined that the Petitioner could not have acted deliberately or with premeditation at the time of the crime because he would have been too impaired to consider alternative actions or appreciate the consequences of his conduct. According to Dr. Brown, the Petitioner's actions after the murder suggest that he was reacting to the situation rather than planning.

Dr. Brown admitted during cross-examination that he did not read the trial transcript. Although he did say that he read the supreme court's opinion which summarized the evidence. Dr. Brown attributed the Petitioner's statements, that he liked to rape women, to fantasy and part of his thought process disorder. However, Dr. Brown acknowledged that the Petitioner had actually attempted rape in the past. Regarding the opinion by a previous mental health expert in 1982 that the Petitioner would be inclined to commit rape and murder in the future, Dr. Brown stated that his view of that opinion was that the expert agreed the Petitioner could not function in the real world unless he was immersed in a structured environment. Dr. Brown believed that the Petitioner's employment at Saint Thomas Hospital prior to his convictions in this case provided the Petitioner with a structured environment.

16

Dr. Brown acknowledged during cross-examination that the Petitioner's conduct after the crimes reflected attempts to evade detection and conceal his involvement. When asked about the Petitioner's thought process after the crimes, Dr. Brown stated that the Petitioner was attempting to solve a problem. According to Dr. Brown, though, the Petitioner did not do a good job of evading detection or concealing his involvement: "It was extremely disorganized behavior and it didn't have any of the evidence that we would anticipate for somebody who had planned and carried out an efficient plan." Dr. Brown's opinion that the Petitioner did not premeditate the murder was based upon his review of the Petitioner's mental health records and "clinical information." Again, Dr. Brown testified that he did not read the transcript of the trial and thus acknowledged that he did not know all of the evidence of the case.

Following examination by counsel, the trial court questioned Dr. Brown about whether the Petitioner was incapable of premeditation. Dr. Brown answered in the negative, but he did not believe there was evidence of premeditation in this particular case based, in part, upon the spontaneous nature of the events and the Petitioner's lack of a relationship with the victim.

Dr. Pamela Auble, a neuropsychologist, was retained by counsel to evaluate the Petitioner before trial. Dr. Auble testified at the evidentiary hearing that the field of neurospychology encompasses the evaluation of people with brain injury to assess their functioning, intelligence, memory, flexibility, motor skills and personality. She was first contacted by counsel on July 9, 1997. Dr. Auble testified that she did not have much time to evaluate the Petitioner but was asked to focus on the Petitioner's emotional functioning and any possible psychosis or disturbance of reality. Dr. Auble testified that counsel provided her with some of the Petitioner's prison records, but she did not receive a copy of the March 1997 MTMHI report. Dr. Auble spent approximately three hours evaluating the Petitioner. Dr. Auble interviewed the Petitioner and administered psychological tests, but she stated that she did not have sufficient time to perform any neuropsychological testing. According to Dr. Auble, psychological tests assess an individual's personality and emotional state while neuropsychological tests measure a person's I.Q., memory, attention and mental flexibility. Dr. Auble testified that, of the fifty people she had evaluated who were on death row in Tennessee, the Petitioner was the only one who did not receive neuropsychological testing.

Dr. Auble concluded that the Petitioner was competent to stand trial and that he was not "floridly psychotic" at the time she interviewed him. Dr. Auble diagnosed the Petitioner with a schizotypal personality disorder. According to Dr. Auble, schizotypal personality disorder is not as severe as schizophrenia. Dr. Auble described someone suffering from the disorder: "They're not overtly psychotic most of the time. They're strange individuals, often

17

paranoid. They have magical thinking. They don't see the world the way other people see it. They can have psychotic episodes but they're usually relatively brief under stress." Dr. Auble believed that the Petitioner did not always accurately perceive situations and that he had trouble relating to other people, especially women.

Dr. Auble did not learn that she would not be called as a witness until after the trial ended. Dr. Auble never met with trial counsel in person. Dr. Auble testified that the information contained in the MTMHI report would have suggested that further neuropsychological testing should have been performed on the Petitioner.

During cross-examination, Dr. Auble acknowledged that Ms. Shettles informed her she was going to forward additional records to her, including the MTMHI report, but Dr. Auble told Ms. Shettles that she was not sure she would be testifying and thus did not know if she needed to actually review those records. Dr. Auble suggested that Ms. Shettles inquire with counsel before forwarding the additional records. Dr. Auble, however, never did receive them. Dr. Auble testified that the Petitioner provided her with his own social history during their meeting, including informing her of his long history of mental health evaluations. Although Dr. Auble was concerned about the Petitioner's history of treatment, she stated that she did not personally request any additional information about the Petitioner. Dr. Auble informed trial counsel that, based upon her evaluation of the Petitioner, the most beneficial testimony she would have been able to contribute was her opinion that the Petitioner would be able to adjust well in prison.

Michael Bredlove was an agent with the Tennessee Bureau of Investigation (TBI) who assisted in the criminal investigation of this case. Although Agent Bredlove stated that he routinely attended the autopsies in cases he worked, he was not present when Dr. Harlan performed the autopsy in this case. Agent Bredlove testified that prior to September 1997 he never had concerns about Dr. Harlan's ability to maintain evidence. Agent Bredlove testified, though, that he disagreed with Dr. Harlan's conclusion about the cause of death in one unrelated case prior to 1997 which ultimately resulted in a murder conviction. Agent Bredlove further testified that he had no other concerns thereafter about Dr. Harlan's ability to accurately identify cause of death or maintain evidence. According to Agent Bredlove, Dr. Harlan disliked the director of the TBI and thus felt that he was treated unfairly at times.

Russ Winkler began working for the TBI in 1998. Prior to that he was an officer with the Clarksville Police Department. In 1995, Agent Winkler investigated the death of a twenty-five-day-old child. According to Agent Winkler, Dr. Harlan performed the initial autopsy on the victim and concluded that the cause of death was accidental. Dr. Harlan's conclusion was that the trauma to the victim's head was not inconsistent with the victim's falling and hitting a coffee table. Agent Winkler testified that another medical examiner

18

performed a second autopsy and offered a different conclusion about the cause of death. The second medical examiner noticed fractures and bruises apparently overlooked by Dr. Harlan. Agent Winkler testified that the suspect in that case thereafter was prosecuted for causing multiple skull fractures to the victim's head and was eventually convicted of murdering the child.

Joseph Craig joined the TBI as an agent in 1998. He testified that he was involved in the criminal investigation in an unrelated case in 1999 wherein Dr. Harlan misidentified the victim in a burning death. Agent Craig also testified that he worked for the Dickson County Sheriff's Office Drug Task Force at the time the victim in this case disappeared. Agent Craig testified that the victim contacted him a couple of times offering information about drug activity in Dickson, the last time about a week before she disappeared. Agent Craig stated, though, that the victim seemed intoxicated both times she called.

Rhonda Felts served as a bailiff in this case. Ms. Felts testified that she was instructed by the court never to discuss anything about the case with the jury. Although she knew Rosemary Jackson, Ms. Felts testified that she never discussed anything about the case with her during trial.

### Burden of Proof and Standard of Review on Appeal

The Petitioner's post-conviction petition is governed by the Post-Conviction Procedure Act. Tenn. Code Ann. §§ 40-30-101 to -122. In order to obtain post-conviction relief, the Petitioner must show that his convictions and sentences are void or voidable because of the abridgment of a constitutional right. Tenn. Code Ann. § 40-30-103. The Petitioner must establish the factual allegations contained in his petition by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(2)(f). Evidence is clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from the evidence. *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App.1998).

Once the post-conviction court rules on the petition, its findings of fact are conclusive on appeal unless the evidence preponderates against them. *State v. Nichols*, 90 S.W.3d 576, 586 (Tenn. 2002) (citing *State v. Burns*, 6 S.W.3d 453, 461 (Tenn.1999)); *Cooper v. State*, 849 S.W.2d 744, 746 (Tenn. 1993)). The Petitioner has the burden of establishing that the evidence preponderates against the post-conviction court's findings. *Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997). This Court may not re-weigh or reevaluate the evidence or substitute its inferences for those drawn by the post-conviction court. *Nichols*, 90 S.W.3d at 586. Furthermore, the credibility of the witnesses and the weight and value to be afforded their testimony are questions to be resolved by the post-conviction court. *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the trial court's application of law

to its factual findings is reviewed *de novo* by this Court with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

Claims of ineffective assistance of counsel are regarded as mixed questions of law and fact. *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001); *Burns*, 6 S.W.3d at 461. As such, the trial court's findings of fact underlying a claim of ineffective assistance of counsel are reviewed under a *de novo* standard, accompanied by a presumption that the findings are correct unless the preponderance of the evidence is otherwise. *Fields*, 40 S.W.3d at 458 (Tenn. 2001) (citing Tenn. R. App. P. 13(d)). However, a trial court's conclusions of law are reviewed under a purely *de novo* standard, with no presumption of correctness. *Id.*

**Issues**

I.      *Ineffective Assistance of Counsel*

The Petitioner claims he received the ineffective assistance of counsel at trial and on appeal. This Court will review in order each instance of misconduct alleged by the Petitioner in his brief on appeal.

The Sixth Amendment provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. This right to counsel is "'so fundamental and essential to a fair trial, and so, to due process of law, that it is made obligatory upon the States by the Fourteenth Amendment.'" *Gideon v. Wainwright*, 372 U.S. 335, 340 (1963) (quoting *Betts v. Brady*, 316 U.S. 455, 465 (1942)). Inherent in the right to counsel is the right to the effective assistance of counsel. *Cuyler v. Sullivan*, 446 U.S. 335, 344 (1980). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *see Combs v. Coyle*, 205 F.3d 269, 277 (6th Cir. 2000).

The United States Supreme Court has adopted a two-prong test to evaluate a claim of ineffectiveness:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

20

*Strickland*, 466 U.S. at 687. The performance prong of the *Strickland* test requires a showing that counsel's representation fell below an objective standard of reasonableness, or "outside the wide range of professionally competent assistance." *Id.* at 690. "Judicial scrutiny of performance is highly deferential, and '[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Combs*, 205 F.3d at 278 (quoting *Strickland*, 466 U.S. at 689).

Upon reviewing claims of ineffective assistance of counsel, courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U .S. at 689. Additionally, the courts will defer to trial strategy or tactical choices if they are informed ones based upon adequate preparation. *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). Finally, we note that criminal defendants are not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 655 n. 38 (1984)). Notwithstanding, we recognize that "[o]ur duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case." *Id.* at 785.

If a petitioner shows that counsel's performance fell below a reasonable standard, then he must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* In evaluating whether a petitioner satisfies the prejudice prong, a court must ask "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993) (citing *Strickland*, 466 U.S. at 687). In other words, a petitioner must establish that the deficiency of counsel was of such a degree that it deprived the defendant of a fair trial and called into question the reliability of the outcome. *Nichols*, 90 S.W.3d at 587. That is, the evidence stemming from the failure to prepare a sound defense or to present witnesses must be significant, but it does not necessarily follow that the trial would have otherwise resulted in an acquittal. *State v. Zimmerman*, 823 S.W.2d 220, 225 (Tenn. Crim. App. 1991). "A reasonable probability of being found guilty of a lesser charge, or a shorter sentence, satisfies the second prong in *Strickland*." *Id.* Moreover, when challenging a death sentence, a petitioner must show that "'there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance

of the aggravating and mitigating circumstances did not warrant death.'"  *Henley*, 960 S.W.2d at 579-80 (quoting *Strickland*, 466 U.S. at 695).

A. Investigation

1. Guilt Phase

The Petitioner argues that trial counsel should have presented evidence demonstrating that he was incapable of forming the requisite culpable mental state required for a finding of first degree premeditated murder instead of challenging the sufficiency of the State's evidence. According to the Petitioner's argument, counsel did not invest enough time into investigating his mental health, and thus they were unable to make an informed decision to forego a diminished capacity type of defense in favor of the theory they ultimately pursued at trial.

The Petitioner is challenging trial counsel's strategy. Mr. Goodlett did not believe the State would be able to prove that the Petitioner committed first degree premeditated murder. The record does not dispute Mr. Goodlett's testimony that defense counsel thoroughly investigated the facts of the crime. In addition, counsel obtained the services of independent experts to challenge those of the State regarding the autopsy findings and the DNA analysis of blood found in the Petitioner's vehicle. The State's proof in this case was entirely circumstantial. On direct appeal, although the majority of the supreme court concluded that the convicting evidence was sufficient, they acknowledged that "the question is close in this case." 121 S.W.3d at 615. Contrary to the Petitioner's suggestion, though, the fact that his convictions were affirmed by a three to two vote does not equate with a presumption that trial counsel should have chosen a different defense strategy. The Petitioner is still required to demonstrate that counsel's performance was deficient and that prejudice resulted.

The Petitioner was evaluated for almost a month at MTMHI prior to trial. Mr. Goodlett testified that he reviewed the MTMHI report. According to that report, the Petitioner was deemed competent to stand trial and there was no support for an insanity defense. The report acknowledged the Petitioner's lengthy criminal record and history of mental health treatment. The report commented on the Petitioner's tendency to exaggerate and his ability prior to his arrest to maintain successful employment. It also noted that the Petitioner declined to answer certain questions about his whereabouts or functioning during the time of the crimes because he was concerned about his legal situation. The Petitioner was determined to have a low-average to average I.Q. MTMHI diagnosed the Petitioner with a personality disorder, not otherwise specified, with schizoid, antisocial and avoidant traits.

Mr. Goodlett testified that he was aware of the Petitioner's criminal background and long history of mental health treatments. Mr. Goodlett acknowledged, though, that the Petitioner had never been declared incompetent to stand trial or otherwise insane. During the evidentiary hearing, Mr. Goodlett acknowledged that information contained in many of the reports from the Petitioner's past evaluations would have been extremely damaging to the defense and that he weighed the probability of that information being exposed to the jury during cross-examination by the State when evaluating his trial strategy. Although the Petitioner faults trial counsel's limited investigation into his mental health, even only a cursory review of the Petitioner's records would have caused any reasonable attorney to strongly consider an alternative approach to the defense. Included in those reports is the following information, including statements attributable to the Petitioner, which Mr. Goodlett testified were included in his case files: the Petitioner was viewed as being manipulative, uncooperative and prone towards lying; the Petitioner was considered a dangerous parolee and would be inclined to commit rape and murder in the future; the Petitioner stated that his problem was that he liked to rape women; the Petitioner stated that he raped over 100 women between 150 and 200 times; the Petitioner stated there are two types of relationships with women, courtship and rape, and that he was no good at courtship; the Petitioner stated that it was difficult to rape because there were a lot of things going on in his mind at the time; the Petitioner said he would continue to assault women after his release from custody; the Petitioner remarked that one of his favorite activities when he was younger was raping girls, that he raped over 100 women, "if you use the legal definition," and that the only difference between making love and committing rape was whether or not the woman enjoyed it; the Petitioner accepted a significant number of rape myths and he saw violence as a way of controlling women; and the Petitioner said he would risk incarceration to spend time alone with a particular woman and said that she would let him lock a chain around her and drive her to East Tennessee. Even trial counsel's mitigation specialist admitted that the Petitioner's records were some of the most unfavorable she had ever encountered.

In support of his argument, the Petitioner relies upon Dr. Brown's opinion that the Petitioner could not have formed the requisite premeditation given the facts of this case. Dr. Brown testified that he read the supreme court's opinion, but he admitted that he did not read the trial transcript. Dr. Brown testified that he based his opinion upon his review of the Petitioner's personal records and other "clinical information." Dr. Brown believed it was more likely that the Petitioner reacted to the situation rather than having planned the crimes in advance. And although he stated that the Petitioner did not do a good job concealing his involvement, Dr. Brown agreed that the Petitioner's actions after the murder did represent attempts to conceal his involvement and avoid detection. Moreover, Dr. Brown acknowledged that the Petitioner was not incapable of ever forming the culpable mental state for first degree murder.

The Petitioner insists that trial counsel did not conduct a thorough enough investigation into his mental health. However, counsel did thoroughly investigate the facts of the crime. This is not a case where trial counsel did not engage in any trial preparation. Instead, the Petitioner simply disagrees with counsel's chosen strategy. Mr. Goodlett testified that counsel discussed trial strategy with the Petitioner and that the Petitioner was aware of the negative information contained in his records. Mr. Goodlett was also aware of the Petitioner's lengthy mental health history but, given the negative information contained in many of the reports, decided that the best defense was to challenge the State's circumstantial evidence.

Reviewing courts must indulge a strong presumption that the conduct of trial counsel falls within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689. Our supreme court has stated:

> "Hindsight can always be utilized by those not in the fray so as to cast doubt on trial tactics a lawyer has used. Trial counsel's strategy will vary even among the most skilled lawyers. When that judgment exercised turns out to be wrong or even poorly advised, this fact alone cannot support a belated claim of ineffective counsel."

*Hellard*, 629 S.W.2d at 9 (quoting *Robinson v. United States*, 448 F.2d 1255, 1256 (8th Cir. 1971)). "It cannot be said that incompetent representation has occurred merely because other lawyers, judging from hindsight, could have made a better choice of tactics." *Id.* This Court must defer to counsel's trial strategy and tactical choices when they are informed ones based upon adequate preparation. *Id.*

As noted earlier, criminal defendants are not entitled to perfect representation, only constitutionally adequate representation. *Denton*, 945 S.W.2d at 796. "Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Moreover, "an accused is not deprived of the effective assistance of counsel because a different procedure or strategy might have produced a different result." *Vermilye v. State*, 754 S.W.2d 82, 85 (Tenn. Crim. App. 1987).

The Court has reviewed the lengthy trial record in light of the Petitioner's post-conviction claim and the evidence presented at the evidentiary hearing. The Court cannot conclude, however, that the decision to challenge the strength of the State's evidence was objectively unreasonable. The Petitioner does not explain how counsel's chosen strategy was erroneous in and of itself. Instead, he argues that trial counsel should have chosen a different strategy altogether. The evidence in this case was entirely circumstantial. The supreme court

24

acknowledged this was a close case. However, just because the jury concluded that the State proved its case beyond a reasonable doubt does not mean that counsel's performance was deficient. Contrary to the Petitioner's argument, trial counsel's decision was an informed one, and one to which deference will be given.

2. Penalty Phase

The Petitioner advances a similar argument about trial counsel's decision regarding the presentation of mitigating evidence. As noted above, Mr. Goodlett testified that the theory of mitigation focused on residual doubt and an attempt to demonstrate that the Petitioner did not deserve to die. During sentencing, trial counsel called the Petitioner's mother, six of his former co-workers, and the prison chaplain to testify about his background and general good nature. The Petitioner argues in the post-conviction context, however, that trial counsel should have presented evidence about his mental health problems instead. The evidence the Petitioner now contends should have been introduced to the jury has been summarized above.

The post-conviction court concluded that counsel were not deficient in their investigation and presentation of the mitigating evidence. The court further concluded that the alternative mitigating evidence introduced during the evidentiary hearing would not have changed the outcome of the jury's verdict at sentencing. The trial court properly analyzed this issue under the standard established by our supreme court in *Goad v. State*, 938 S.W.2d 363 (Tenn. 1996). When considering a claim that trial counsel failed to present sufficient mitigating evidence, our supreme court has directed the reviewing courts to consider the following: (1) the nature and extent of the mitigating evidence that was available but not presented; (2) whether substantially similar mitigating evidence was presented to the jury in either the guilt or penalty phase of the proceedings; and (3) whether there was such strong evidence of aggravating factors that the mitigating evidence would not have affected the jury's determination. *Id*. at 371.

In the context of capital cases, a defendant's background, character, and mental condition are unquestionably significant. "[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring). The right that capital defendants have to present a vast array of personal information in mitigation during the sentencing phase, however, is constitutionally distinct from the question of whether counsel's choice about what information to present to the jury was professionally reasonable. The basic concerns of counsel during a capital sentencing proceeding are to neutralize the

25

aggravating circumstances advanced by the State and to present mitigating evidence on behalf of the defendant. Although there is no requirement to present mitigating evidence, counsel does have the duty to investigate and prepare for both the guilt and the penalty phase. *See Goad*, 938 S.W.2d at 369-70; *Zagorski v. State*, 983 S.W.2d 654, 657 (Tenn. 1998).

Deference must be given to an informed trial strategy. *Hellard*, 629 S.W.2d at 9. Trial counsel's conduct should not be measured in hindsight but, instead, should be assessed from counsel's perspective at the time. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Furthermore, the fact that a particular strategy failed or even hurt the defense does not, alone, support a claim of ineffective assistance of counsel. *Id.* Although there is no absolute duty to investigate particular facts or a certain line of defense, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. In determining whether counsel breached this duty, counsel's performance is reviewed "for 'reasonableness under prevailing professional norms,' which includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (quoting *Strickland*, 466 U.S. at 688-89)). Counsel is not required to investigate "every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." *Id.* at 533. Nor is counsel required to interview every conceivable witness. *See Hendricks v. Calderon*, 70 F.3d 1032, 1040 (9th Cir. 1995). In other words, counsel's duty to investigate and prepare is not limitless. *Id.*

Again, this is not a case in which counsel failed to conduct any investigation or present any mitigating evidence. The Petitioner is challenging trial counsel's decision to forego the presentation of one type of mitigation theme in favor of another. Mr. Goodlett testified that he was aware of the Petitioner's mental health background and, even after only an allegedly cursory review, knew the information contained in many of the reports would have been extremely damaging to the Petitioner's case during sentencing. Accordingly, Mr. Goodlett decided instead to call lay witnesses who would support the Petitioner's claim that his life should be spared.

In denying relief on this ground, the post-conviction court made the following statements:

> [T]rial counsel were faced with a dilemma. They sought mitigation proof based upon Petitioner's mental health difficulties, but the evidence available at trial would have also opened the door to the introduction of damaging evidence which would have severely undermined the effectiveness of the mental health evidence. In his post-hearing brief, Petitioner insists that the evidence of [his] mental health difficulties would have outweighed any

26

prejudicial effect that the evidence of [his] state of mind with respect to women would have had. This Court disagrees. This evidence would have been potentially devastating. Thus, trial counsel made the difficult decision not to present the mental health evidence.

. . .

Suffice it to say that trial counsel was aware of Petitioner's mental health difficulties although certainly not to the extent that they were presented at the hearing on the Post-Conviction Petition. Trial counsel knew enough to know that the presentation of a mental health defense in the penalty phase would [have been] a "two-edged sword." The theory of defense was that the State had not proven the guilt of Petitioner beyond a reasonable doubt and, in the penalty phase, that there was sufficient doubt of Petitioner's guilt that the death penalty should not be imposed. This is a valid defense theory. . . . This Court finds trial counsels' preparation in this area to have been adequate to determine the relative merits of a mental health defense. Obviously, trial counsel did not make [as] exhaustive an investigation into Petitioner's mental health as did post-conviction counsel but, having decided that the disadvantages of such a defense outweighed the possible advantages, such a [thorough] investigation was unnecessary. Trial counsel had determined that another defense theory had a greater chance of success. This being the case, trial counsel cannot be found to have been ineffective.

This Court agrees. As the trial court observed, post-conviction counsel engaged in a more in-depth presentation of evidence into the Petitioner's mental health. However, even though trial counsel may have only briefly reviewed some of the Petitioner's records, that was sufficient to allow counsel to make an objectively reasonable decision which this Court will not now second-guess. This Court must indulge a strong presumption that the conduct of trial counsel falls within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689. We must also defer to counsel's strategic choices in the presentation of their defense. *Hellard*, 629 S.W.2d at 9. Our review of the record in this case leads us to conclude that trial counsel reasonably decided to avoid allowing the jury to hear the negative information summarized above. Indeed, that information could not have been well-received by the jury, especially when it already knew the Petitioner had previous convictions for assault and battery with intent to commit rape and felonious sexual battery, among others. This Court concludes that trial counsels' presentation of their case at sentencing was not deficient or otherwise unreasonable.

B. Dr. Harlan's Testimony

27

The Petitioner contends trial counsel failed to object to Dr. Harlan's testimony that the victim's death probably occurred within twenty-four hours of when she was last seen alive or that her death was the result of homicide. In addition, the Petitioner argues that trial counsel should have challenged Dr. Harlan's alleged failure to preserve parts of the victim's body.

The Petitioner is unable to demonstrate how counsel's performance was deficient with respect to the first two contentions. As both the trial court and State observe, experts in the field of forensic pathology are routinely permitted to opine about both the time and manner of death. *See, e.g., Dellinger v. State*, 279 S.W.3d 282 (Tenn. 2009) (case involving "battle of experts" regarding victim's time of death) and *State v. Bragan*, 920 S.W.2d 227 (Tenn. Crim. App. 1995) (acknowledging that expert may opine that death was result of homicide). Moreover, trial counsel did, in fact, call their own expert witness who disputed Dr. Harlan's opinions in both respects. Counsel did not simply acquiesce to the State's evidence but instead, and in line with their chosen theory of defense, actively challenged Dr. Harlan's testimony. Counsels' performance thus cannot be considered objectively unreasonable.

Nevertheless, the Petitioner is unable to show prejudice. As the trial court concluded, "[t]he exact timing of the death of the deceased is simply not critical." The testimony of all three experts who testified about the time of death necessitated that it occurred within a few days of when she was last seen alive, and other evidence placed the Petitioner in the woods where the victim was discovered approximately one week after the victim was last seen alive. Furthermore, the supreme court concluded that, although the evidence did not reveal the precise cause of death, the jury's verdict that the act was premeditated was otherwise supported by the totality of the evidence. The sufficiency of the convicting evidence has already been challenged.

The Petitioner also contends that trial counsel were ineffective because they failed to adequately challenge Dr. Harlan's failure to preserve parts of the victim's body during the autopsy. Specifically, the Petitioner argues that counsel should have moved for a dismissal of the indictment or the option of the death penalty as a sentence, or should have at least requested a limiting instruction because Dr. Harlan did not preserve the cervical vertebrae, the scapula or the radius and ulna off the left arm following the autopsy.

As both the State and the trial court recognize, Tennessee's leading case addressing the State's failure to preserve evidence was issued after the trial in this case. In *State v. Ferguson*, our supreme court held that if the proof demonstrates the State had a duty to preserve the evidence at issue, but failed to do so, then the analysis of the issue focuses on several factors for an appropriate remedy, which may entail dismissal of the charges or a limiting jury instruction. 2 S.W.3d 912, 917 (Tenn. 1999). Those factors include the degree

of negligence involved, the significance of the destroyed evidence considered in light of the probative value and reliability of any remaining secondary or substitute evidence, and the sufficiency of the other convicting evidence. *Id.*

Because *Ferguson* was not decided until after the Petitioner's trial, counsel's failure to move for a dismissal of the charges or request an instruction about Dr. Harlan's handling of the evidence at issue cannot be considered objectively unreasonable. Nevertheless, the Petitioner is otherwise unable to demonstrate any resulting prejudice. The sufficiency of the convicting evidence has previously been upheld and, in its analysis of whether the murder was premeditated, the supreme court did not reference any of the expert testimony concerning the removal of the victim's head or arm. 121 S.W.3d at 614-16. Moreover, the supreme court recognized that the precise cause of the victim's death was undetermined and that there was no dispute that areas of the victim's body, including the neck and arm, exhibited signs of trauma inflicted by both human and animal activity.

The Petitioner also argues that trial counsel should have attempted to impeach Dr. Harlan's reputation. Though counsel did not question Dr. Harlan about allegations surrounding his practice in general, of which Mr. Goodlett was aware, trial counsel did call their own expert witness to dispute Dr. Harlan's findings. Accordingly, trial counsel did, in fact, otherwise attempt to impeach Dr. Harlan. As the supreme court acknowledged, the precise cause of death was undetermined. Nevertheless, during its review of the sufficiency of the evidence, the supreme court concluded that "no single piece of evidence was sufficient in and of itself to establish premeditation" but that, instead, "the facts and circumstances as a whole were sufficient." 121 S.W.3d at 616. Given our review of the record, we cannot conclude that counsel's failure to *further* impeach Dr. Harlan deprived the Petitioner of a fair trial or called into question the reliability of the outcome. *Nichols*, 90 S.W.3d at 587. We discuss in greater detail below the Petitioner's *Brady* claim regarding information about Dr. Harlan.

C. Hotel Visit

The Petitioner contends trial counsel created an actual conflict of interest which mandated their withdrawal from the case after they visited the hotel where the jurors were sequestered during trial. Similarly, the Petitioner argues that, based solely on counsel's visit, the jury was unfairly tainted with extraneous information.

Mr. Goodlett admitted during the evidentiary hearing that he and his co-counsel visited the hotel while the jury was onsite in order to make sure the jurors did not have access to any newspaper boxes. The trial judge was made aware of the incident soon after it

happened and admonished counsel, outside the presence of the jury, against any future visits to the hotel.

In denying relief on this ground for post-conviction relief, the trial court stated:

Although trial counsels' actions in visiting the jury's motel were certainly unwise, their actions do not appear to have prejudiced Petitioner. No questions were asked of the juror who testified at the evidentiary hearing about her reaction to the incident. There is no proof that the jurors received any outside information [or] influences. As such, there was no need for the remedies suggested by Petitioner. Although trial counsels' inappropriate actions may have cause[d] some excitement among some jurors, there is no indication that these actions affected the verdict of the jury. This Court cannot imagine that these actions by trial counsel could have caused any juror to return a verdict different than that which was returned in this case.

This Court agrees. As both parties recognize, "when it has been shown that a juror was exposed to extraneous prejudicial information or subjected to improper influence, a rebuttable presumption of prejudice arises, and the burden shifts to the State to explain the conduct or demonstrate that it was harmless." *Walsh v. State*, 166 S.W.3d 641, 647 (Tenn. 2005). The Petitioner, however, did not present clear and convincing proof that any of the jurors were actually exposed to any extraneous prejudicial information or improper influence by counsel. Despite the Petitioner's argument to the contrary, trial counsels' actions, while ill-advised, did not create an actual conflict of interest resulting in a presumption of prejudice under the *Strickland* analysis. Although counsel may have been seen by one or more jurors, their mere presence at the hotel, without direct proof of any contact or communication with any juror, does not equate to exposure to extraneous prejudicial information or improper influence. Accordingly, counsel's actions cannot be said to have prejudiced the Petitioner's right to a fair and impartial trial.

D. Change of Venue

The Petitioner challenged on direct appeal the trial court's denial of his motion for a change of venue. The supreme court denied relief on the issue. 121 S.W.3d at 613. The court noted that trial counsel supported their pretrial motion with numerous newspaper articles as well as a videotape of a newscast, and the court recounted counsels' argument during the hearing on the motion in which they emphasized that the various news reports detailed the facts of the case, including the Petitioner's criminal record, and that the victim was the member of a prominent local family. *Id.* at 610. The supreme court further noted

30

that the trial court conducted a full evidentiary hearing on the motion and issued a written order detailing its analysis. *Id.*

During its analysis, the supreme court recognized that trial venue may be changed "'if it appears to the court that, due to undue excitement against a defendant in the county where the offense was committed or any other cause, a fair trial probably could not be had.' Tenn. R. Crim. P. 21(a); *see also State v. Dellinger*, 79 S.W.3d 458, 481 (Tenn. 2002) (appendix)." *Id.* at 611. As the court observed, the trial court has the discretion to determine whether to grant a motion for change of venue and that determination will not be reversed absent a clear abuse of discretion. *Id.* at 611-12. The court cited the well-settled rule that "before a conviction will be reversed for the trial court's failure to grant a change of venue, an accused must establish 'that the jurors who actually sat were biased and/or prejudiced.'" *Id.* at 612 (quoting *Dellinger*, 79 S.W.3d at 481). The supreme court concluded:

> Accordingly, the record shows that the trial court held an extensive evidentiary hearing and considered numerous relevant factors in determining whether to grant a change of venue. The trial court also conducted a lengthy and detailed voir dire process that was devoted to determining the nature and extent of exposure to media coverage of the defendant and victim as well as its potential effect on the views of the potential jurors. There is no evidence that any juror was actually biased or prejudiced against [the Petitioner]. We therefore conclude that the trial court did not abuse its discretion in denying [the Petitioner's] motion for a change of venue.

*Id.* at 613.

The Petitioner now contends that trial counsel did not effectively present their motion for change of venue. The Petitioner suggests that counsel should have retained the services of a jury consultant and should have "vetted" the venire in order to present more evidence at the hearing in support of their request. The trial court denied this ground for post-conviction relief:

> Although Mr. Goodlett acknowledged that the trial court denied the change of venue motion because defense counsel failed to present adequate proof supporting the motion, Petitioner did not present any proof at the evidentiary hearing regarding the extent to which the seated jurors were exposed to publicity regarding the case before or during trial. While there was evidence of pre-trial publicity, the fact is that a jury was seated and these jurors were not shown to have been influenced by this publicity. Thus, the Court finds that

31

Petitioner has not established that trial counsels' actions in presenting the change of venue motion prejudiced Petitioner.

This Court agrees. Although the Petitioner argues that "further inquiry into what the jurors' thought is now blocked," the Petitioner had the post-conviction burden of proving the factual allegations supporting his grounds for relief by clear and convincing evidence. The Petitioner has failed to do so in this instance. Trial counsel filed a motion for change of venue and raised the issue on direct appeal. The Petitioner's argument in post-conviction that the presentation of additional or different evidence at the hearing on the motion for change of venue might have affected the trial judge's decision is not enough to establish that counsel's conduct was deficient or that prejudice resulted. The Petitioner's challenges to counsels' conduct during voir dire are addressed below.

E. Jury Selection

1. Aggravating Circumstances

The Petitioner contends that trial counsel were ineffective for failing to object when the trial court read all of the statutory aggravating circumstances to the jurors during voir dire. As the trial court noted in post-conviction, *instructing* the jury on inapplicable aggravating circumstances is error which may otherwise be deemed harmless. *See State v. Blanton*, 975 S.W.2d 269, 281 (Tenn. 1998). However, the trial court's recitation of all of the statutory aggravating circumstances during voir dire while explaining to potential jurors the capital sentencing process was not error. *See State v. Robinson*, 146 S.W.3d 469, 525 (Tenn. 2004). The jury selected in this case was only instructed on those aggravating circumstances sought by the State. *See id.* Thus, counsel cannot be deemed ineffective for failing to object in this instance.

2. Mitigating Evidence

The Petitioner contends that trial counsel should have objected when the trial court allegedly informed two jurors they were not required to give weight to mitigating evidence. In denying relief on this ground, the trial court stated:

The law is, of course, that jurors must be able to consider and give effect to mitigating evidence. The trial judge simply stated that the jurors were free to give no weight to mitigating circumstances. In other words, after evaluating the mitigating evidence, the jurors were free to reject it if they so chose. The statement of the trial court was correct and counsel cannot be ineffective for failure to object when the court is not in error.

32

We agree. In the two instances cited by the Petitioner, the trial court properly informed the jurors that they alone were responsible for deciding how much weight to assign the mitigating evidence. Trial counsel cannot be deemed ineffective for objecting to those statements.

### 3. Pretrial Publicity

The Petitioner advances a blanket statement that "trial counsel failed to adequately investigate whether members of the jury pool had been tainted by the prejudicial pre-trial publicity." The Petitioner offers no argument in support thereof. This ground for relief must, therefore, be considered waived. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). Nevertheless, the supreme court observed on direct appeal that the record "demonstrates that the trial court conducted a meticulous and detailed jury selection process from August 4 to August 19, 1997" that "involved over two hundred potential jurors" and "was devoted to determining the nature and extent of exposure to media coverage of the defendant and victim as well as its potential effect on the views of the potential jurors." 121 S.W.3d at 612, 613. The Petitioner is not entitled to relief on this ground.

### 4. Individual Jurors

The Petitioner contends trial counsel were ineffective for failing to peremptorily strike or move to excuse certain jurors for cause.

#### i. Juror Joy Anderson

The Petitioner argued on direct appeal that Juror Anderson was prejudiced against him because her younger brother was a friend of the victim's son. 121 S.W.3d at 612. The supreme court rejected that argument concluding that its review of the voir dire demonstrated that Juror Anderson was not prejudiced against the Petitioner or biased in favor of the victim. *Id.* at 613. The court observed that Juror Anderson stated "she would not 'lean one way or the other' if selected to serve as a juror and that her son's [sic] relationship with [the victim's] family would not influence her in any way." *Id.* at 612. The supreme court noted, though, that Juror Anderson was not challenged for cause. *Id.* at 613.

In post-conviction, the Petitioner now contends that counsel were ineffective for failing to challenge Juror Anderson for cause. The trial court, however, concluded that even if counsel had challenged Juror Anderson for cause, the challenge would have been denied. The record does not discredit that conclusion. The Petitioner has failed to demonstrate how

Juror Anderson was actually prejudiced against him. Accordingly, counsel cannot be deemed ineffective for moving to excuse her for cause or using a peremptory challenge against her.

### ii. Juror Joyce Baldwin

The Petitioner claims counsel should have moved to excuse Juror Baldwin for cause or used a peremptory challenge against her because, when asked how she would react to graphic evidence, she answered that it would have an impact on her ability to hear mitigating evidence. The trial court denied relief stating:

> This answer strikes the Court as reasonable. Facing the realities of a gruesome murder would certainly impact even the thought processes of any reasonable, feeling person. The question, however, [is] not whether the gruesome evidence would "have an impact" upon a juror's ability to hear mitigation evidence but whether it would affect it. Fair-minded, reasonable people are able to recognize potential[] emotions and not allow them to interfere with their deliberative process. If the juror could follow the instructions of the trial court and apply the law to the facts without sympathy, prejudice or passion (and there is no indication in the record that she could not), the juror is competent. Experienced trial lawyers know that some jurors, recognizing their potential prejudice, will overcompensate for it, resulting in being more favorable to the side presenting the difficulty than they otherwise would have been. Whether trial counsel determined that this may have been the case with Juror Baldwin, we do not know because Mr. Goodlett was not asked about it at the post-conviction hearing.
>
> There certainly was no basis for a challenge for cause. The entire questioning of Juror Baldwin established that she would be able to reach a just verdict by applying the law to the facts in spite of any emotional reaction to graphic evidence.

The record fully supports the trial court's finding that Juror Baldwin could follow the law and base her verdict on the evidence presented at trial. The Petitioner has simply failed to demonstrate how counsel was ineffective for moving to excuse Juror Baldwin from the panel.

### iii. Juror Rosemary Jackson

The Petitioner contends that trial counsel should have moved to excuse Juror Jackson for cause or used a peremptory challenge against her because her husband worked for the

Dickson County Sheriff and because of responses she gave to questions about this case in particular and the death penalty in general. In denying the Petitioner relief with respect to this contention, the trial court stated the following:

When questioned . . . concerning whether Juror Jackson's husband had talked about his work, the juror responded, "No, not that much. He's a quiet person. We usually gripe about co-employees and bosses." This is hardly evidence of favoritism toward the Dickson County Sheriff's Office and, if it indicates anything, it would tend to show that the juror would have a negative attitude in that respect.

. . . Juror Jackson was asked by the trial court, "Is there any possibility that what you've heard here in the case could interfere with your judgment in this case?" The juror answered, "Yes, sir." In this Court's opinion, every juror who was asked this question ("...is there *any possibility*...") would have answered the question in the affirmative. There is always *some* possibility. It should be noted that when the juror was asked by the State . . . "Would you let anything enter into your verdict other than the law and the evidence?", she responded, "Hopefully not. I would try my best not to." This impresses this Court as a thoughtful and truthful answer. The juror was specifically asked . . . "For purposes of approaching this case, it would probably be better that you didn't assume that whatever you heard was accurate, just totally set it aside and assume it wasn't true and never let it enter into your verdict. Could you do that?" The juror replied, "Yes, sir." The answers of the juror, when taken as a whole, indicate that she would be able to render a verdict based solely upon the law and evidence in this case.

Petitioner has alleged that the juror was in favor of the death penalty as a cost-saving measure. What she actually said was, "Mostly the expense of housing criminals. I think it depends on the crime. I just felt like some people deserve the death penalty. They were just such terrible people that they deserved it. I don't know. I don't honestly know. I just started thinking about it and decided that in some circumstances some people do deserve it." This answer impresses this Court as a thoughtful and correct answer indicating an open mind as to whether or not the death penalty should be imposed. The defense asked the juror . . . "The Court instructed you that the death penalty is reserved for the most heinous and serious crimes, what would you do if you did not feel the government has shown you this is one of the most heinous crimes?" The juror answered, "Then I wouldn't vote for the death penalty." The answers of

this juror can hardly be characterized as being in favor of the death penalty as a cost-saving measure.

The answers of Juror Jackson during voir dire do not indicate anything but an open mind toward a fair consideration of the case. There was no basis for a challenge for cause and no indication that trial counsel should have excused the juror peremptorily. Trial counsel have not been shown to have been ineffective in failing to challenge this juror.

After our review of the entire questioning of Juror Jackson, this Court agrees with the post-conviction court's conclusion that there was no basis for a challenge for cause. Juror Jackson stated that her husband was not involved in this case in any way and he did not discuss anything about the Petitioner with her. When asked whether she could set aside anything she had heard or read about the case, Juror Jackson unequivocally replied in the affirmative. Moreover, Juror Jackson clearly indicated that she could follow the law as instructed in this bifurcated death penalty trial. Juror Jackson stated that defendants convicted of first degree murder should not always be sentenced to death but that, instead, the penalty should depend on the evidence presented. Accordingly, Juror Jackson stated that she would not vote for the death penalty if she did not believe the State proved its case. When asked by trial counsel, "Do you currently have any expectations the defendant should show something to you during the course of the trial?", Juror Jackson replied, "No, because he doesn't have to prove he's innocent, his guilt or innocence."

The overall tenor of Juror Jackson's responses to questions asked during voir dire clearly indicated she would be able to follow the court's instructions and decide the case on the facts presented at trial. The Petitioner has simply failed to demonstrate how counsel was ineffective for moving to excuse Juror Jackson from the panel or how he was otherwise prejudiced by counsel's failure to use a peremptory challenge on her. Although Juror Jackson's testimony during the evidentiary hearing, that her husband expressed to her his feeling about the Petitioner's guilt, contradicted what she informed the trial court and counsel during voir dire, she reaffirmed that she maintained no predisposition about the Petitioner's guilt or innocence. The record of the jury selection reveals that trial counsel had no reasonable basis at that time to doubt Juror Jackson's answers. Moreover, nothing about Juror Jackson's post-conviction testimony demonstrates that the Petitioner was actually prejudiced by trial counsel's failure to strike her peremptorily. The Petitioner is not entitled to relief on this ground.

iv. Juror Jerry Greer

36

The Petitioner contends trial counsel were ineffective by asking Juror Greer if he could consider childhood abuse as a mitigating circumstance when no such evidence was actually presented at trial. Other than this one sentence complaint, the Petitioner offers no other argument in support thereof. This ground for relief, therefore, must be considered waived. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). Nevertheless, the trial court concluded that there was no evidence in the record that Juror Greer was negatively affected by trial counsel's conduct. The Petitioner has simply failed to demonstrate how trial counsel were deficient in their questioning of this juror during voir dire. As the trial court commented, trial counsel's questions simply appeared to gauge how Juror Greer would be able to consider mitigating evidence in general. Moreover, Attorney Love conducted the questioning of Juror Greer, and he was not called as a witness during the evidentiary hearing to explain his actions. The Petitioner is not entitled to relief on this ground.

### v. Juror David Higgins

The Petitioner contends trial counsel should have used a peremptory challenge to strike Juror Higgins because he stated that he did not believe a sentence of life without the possibility parole served any deterrent function. Again though, other than this one sentence complaint, the Petitioner offers no other argument in support thereof. This ground for relief must, therefore, be considered waived. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). Nevertheless, the Petitioner has not shown how trial counsel's performance was deficient in this instance. The trial court observed that, "[w]hen taken as a whole, the answers of Juror Higgins do not indicate a predisposition to vote for the death penalty. His answers indicated that he would fairly apply the law to the best of his ability." Indeed, our review of the voir dire of Juror Higgins reveals that he confirmed he would be able to follow the court's instructions, including the instructions regarding the weighing of aggravating and mitigating factors, and would consider only that evidence which that was presented at trial. Moreover, Juror Higgins agreed with the way our capital sentencing procedure worked and stated that it seemed fair. The Petitioner is not entitled to relief on this ground.

### vi. Juror William Duke

The Petitioner contends trial counsel should have used a peremptory challenge or moved to strike Juror Duke for cause because he stated that he did not "think" he would be able to consider as a mitigating circumstance the fact that the Petitioner had a poor upbringing. The Petitioner offers no argument in support of the one sentence he included in

37

his brief. This ground for relief must, therefore, be considered waived. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). Again though, despite waiver, the Petitioner has not demonstrated how counsel's performance was deficient in this respect. According to the transcript, Juror Duke believed that a sentence of life without the possibility of parole was an equal deterrent as the death penalty. Indeed, Juror Duke stated that the gruesome facts in this case alone would not cause him to reject a sentence of life without parole in favor of death. Moreover, he stated that he understood how the weighing process operated in the capital sentencing scheme, and he affirmed that he would be able to follow the court's instructions. The trial court concluded that Juror Duke's responses, when viewed in their entirety, "could have indicated to trial counsel an openness to a sentence short of death that would have outweighed the juror's views on the effect of an impoverished upbringing." The record fully supports the trial court's conclusion.

### 5. Victim's Daughter

The Petitioner contends trial counsel should have objected to Jennifer Koch, the victim's daughter, sitting at the table with the prosecutor during jury selection. The trial court noted that the appellate courts of this state "have long rejected assertions that the presence of a victim's family member at or near the prosecution's table at trial or during voir dire would somehow unfairly prejudice a defendant." *See, e.g., State v. Henry Eugene Hodges*, No. 01C01-9212-CR-00382, 1995 WL 301443 at \*17-20 (Tenn. Crim. App., May 18, 1995), *aff'd*, *State v. Hodges*, 944 S.W.2d 346 (Tenn. 1997). Accordingly, the Petitioner has not demonstrated how counsel's failure to object to the mere presence of the victim's daughter was deficient. As this Court recognized in *Hodges*, "there is a common law rule which permits the prosecutor or an interested witness to sit at counsel table with the assistant district attorney general prosecuting the accused. This has been the practice for many years." *Id.* at 19. Nevertheless, the trial court properly instructed the jury on the law in this case and the Petitioner has failed to highlight any apparent problems in the record which could be attributed to the victim's daughter sitting at the table. *See id.* at 20. The Petitioner has thus failed to show any resulting prejudice.

The Petitioner also contends trial counsel should have objected when the prosecutor referred to Ms. Koch as the victim's daughter. The trial court concluded that the "term 'victim' did not represent an improper opinion on Petitioner's guilt." Furthermore, as the State observes, the prosecutor initially referred to Ms. Koch as the daughter of the "alleged" victim, but when the prosecutor subsequently omitted the term "alleged" during another reference, trial counsel did not voice an objection which the trial court, in essence, sustained. The Petitioner, however, has not referred the Court to any part of the record wherein he believes counsel should have objected to the prosecutor's comments. *See* Tenn. Ct. Crim.

App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). Moreover, to the extent the Petitioner is otherwise raising a general claim regarding his right to a fair trial or impartial jury because of Ms. Koch's presence at the prosecutor's table, the issue is waived because he did not raise it earlier. *See* Tenn. Code Ann. § 40-30-106(g).

F.  Prosecutorial Misconduct

The Petitioner alleges several instances where trial counsel were ineffective for failing to object to alleged prosecutorial misconduct.

> Our supreme court has long recognized that closing argument is a valuable privilege for both the State and the defense and have allowed wide latitude to counsel in arguing their cases to the jury. *State v. Cauthern,* 967 S.W.2d 726, 737 (Tenn. 1994) . . . Notwithstanding such, arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law. *Coker v. State,* 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995). We are mindful of the oft quoted principle that a prosecutor must be free to present his arguments with logical force and vigor, "[b]ut, while he may strike hard blows, he is not at liberty to strike foul ones." *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935).

> When argument is found to be improper, the established test for determining whether there is reversible error is whether the conduct was so improper or the argument so inflammatory that it affected the verdict to the Appellant's detriment. *Harrington v. State,* 215 Tenn. 338, 385 S.W.2d 758, 759 (1965). In measuring the prejudicial impact of any misconduct, this court should consider: (1) the facts and circumstances of the case; (2) any curative measures undertaken by the court and the prosecutor; (3) the intent of the prosecution; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case. *Judge v. State,* 539 S.W.2d 340, 344 (Tenn. Crim. App.1976); *see also State v. Buck,* 670 S.W.2d 600, 609 (Tenn. 1984).

*State v. Goltz*, 111 S.W.3d 1, 5-6 (Tenn. Crim. App. 2003). This Court recognized that, within the context of closing argument, there are five general areas of prosecutorial misconduct:

1.  It is unprofessional conduct for the prosecutor intentionally to misstate the

evidence or mislead the jury as to the inferences it may draw.

2. It is unprofessional conduct for the prosecutor to express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.

3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.

4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict.

5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

*Id.* at 6. To the extent the Petitioner advances a separate claim of prosecutorial misconduct with respect to each alleged instance discussed below, however, the same must be considered waived because he failed to raise it on direct appeal. *See* Tenn. Code Ann. § 40-30-106(g).

### 1. Cross-Examination of Dr. Peretti

The Petitioner contends trial counsel failed to request an appropriate remedy when the prosecutor asked defense expert Dr. Frank Peretti whether he "learned that criminal defendants sometimes cut peoples' heads off and take them away as trophies." Immediately following this question, though, trial counsel voiced an objection which was sustained. The Petitioner does not argue what else counsel should have done. Accordingly, given that counsel did, in fact, object, we cannot deem their performance to be deficient in this respect.

The Petitioner also contends that the prosecutor erroneously referred to Dr. Peretti as an employee of defense counsel. The record reveals that Dr. Peretti acknowledged he had been retained by defense counsel to review the evidence and testify on the Petitioner's behalf. The Petitioner, however, does not explain how trial counsel were ineffective with respect to these questions. As the State notes, asking Dr. Peretti if he was retained by the defense was proper, *see* Tennessee Rule of Evidence 616, thus counsel cannot be deemed to have been ineffective in failing to object.

### 2. Opening Argument at Guilt Phase

The Petitioner next asserts trial counsel should have objected to the prosecutor's statement during opening argument at the guilt phase of the trial that "we will also never, never know what pain and suffering this lady went through before she was killed." According to the Petitioner's argument, the statement was improper because the State abandoned its reliance on the heinous, atrocious or cruel aggravating circumstance. The trial court concluded that Mr. Goodlett offered sound strategy for not highlighting the statement to the jury. We agree. Having reviewed this single remark in light of the prosecutor's entire opening statement, we cannot conclude that trial counsel were ineffective for failing to object.

### 3. Closing Argument at Guilt Phase

The Petitioner cites to numerous statements made by the prosecutor during closing argument at the guilt phase of the trial to which he argues trial counsel should have objected. Although the Petitioner mentions that these occurred during closing argument at sentencing, it is clear from this Court's review of the record that the statements were actually made by the prosecutor during closing arguments at the guilt phase. The Petitioner appears to have made the same mistake when examining Mr. Goodlett during the evidentiary hearing. Mr. Goodlett was asked why he did not object to certain statements the prosecutor made "*in opening at sentencing* speculating about what happened that night, such things as: did he have a gun that night; did he force her to get out of her clothes; did he use handcuffs, a knife, a sawed-off shotgun; did he grab her and chase her down, things like that." (Emphasis added). The trial court recognized the Petitioner's apparent confusion about when the alleged improper statements were made because it concluded that Mr. Goodlett was not asked about his failure to object to the State's alleged speculation of events made during closing *at the guilt phase*.

On appeal, the Petitioner highlights similar statements from the prosecutor's argument which he claims contain improper speculation about the evidence. The Petitioner, however, offers no argument in support of how he believes counsel rendered ineffective assistance with respect to any of these statements. Nevertheless, this Court has read the transcript of the closing arguments of the parties and concludes that the trial court did not err in denying relief on this ground. The trial court concluded that "even if trial counsel had objected, the object[ion] was sustained and a curative instruction issued, there is no reasonable possibility that even one juror would have decided the case differently." Moreover, as the trial court noted, the jury was instructed that arguments of counsel were not evidence, that it was to disregard any statements of counsel not supported by the evidence, and that its verdict was to be based solely upon the proof at trial. The jury is presumed to have followed the trial court's instructions on the law. The Petitioner thus has failed to demonstrate how there was any resulting prejudice from counsel's failure to object. *See, e.g., State v. Jordan*, 325

S.W.3d 1, 60-61 (Tenn. 2010) (finding harmless error in alleged improper remarks by prosecutor because any misstatements sufficiently corrected by trial court's instructions on law which jury is presumed to follow).

### 4. Opening Argument at Sentencing Phase

The Petitioner argues counsel were ineffective for failing to object to the prosecutor's statements made during opening arguments at the sentencing phase which "repeatedly and relentlessly engaged in speculation about the circumstances of the crime, what the decedent might have felt, and what the defendant might have done." The Petitioner contends these "arguments were inflammatory, not based in [sic] evidence appearing in the record, and designed to inflame the passion of the jury." Although the Petitioner cites to relevant case law affirming that prosecutors must generally confine their arguments to the evidence, *see, e.g., Judge v. State,* 539 S.W.2d 340 (Tenn. Crim. App. 1976), the Petitioner neglects to specifically pinpoint in the record those statements made by the prosecutor about which he now complains. Accordingly, the Court considers this post-conviction ground for relief to be waived on appeal. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

### 5. Petitioner's Statement to Police

The Petitioner contends that trial counsel should have objected to the following comments made by the prosecutor during closing argument at the guilt phase when she was discussing the Petitioner's statement to the police prior to his arrest: "He was sitting there talking to them about all this stuff. Did you ever hear them say that he said, boys, you all are crazy. Why are you all talking to me about this? What do you mean where her head is? I don't know where her head is." According to the Petitioner, the comment improperly suggested that he had a duty to deny the charges against him. The trial court concluded that counsel were not ineffective for failing to object to this comment. The court noted that Mr. Goodlett was not questioned about this comment during the evidentiary hearing. The court also noted that the jury was instructed that the Petitioner was presumed innocent and that the arguments of counsel were not to be considered evidence upon which they could base their verdict.

This Court agrees with the trial court's conclusion. "The decisions of a trial attorney as to whether to object to opposing counsel's arguments are often primarily tactical decisions." *Derek T. Payne v. State,* No. W2008–02784–CCA–R3–PC, 2010 WL 161493, at *15 (Tenn. Crim. App., Jan. 15, 2010), *perm. to app. denied* (Tenn., May 11, 2010). Trial counsel could decide not to object for several valid reasons, including not wanting to

emphasize unfavorable evidence. *Id.* (quoting *Gregory Paul Lance v. State,* No. M2005–01675–CCA–R3–PC, 2006 WL 2380619, at *6 (Tenn. Crim. App., Aug. 16, 2006), *perm. appeal denied* (Dec. 18, 2006)). Accordingly, trial counsel must be given the opportunity to explain why they did not object to the allegedly prejudicial remarks. "Without testimony from trial counsel or some evidence indicating that his decision was not a tactical one, we cannot determine that trial counsel provided anything other than effective assistance of counsel." *State v. Leroy Sexton,* No. M2004–03076–CCA–R3–CD, 2007 WL 92352, at *5 (Tenn. Crim. App., Jan. 12, 2007). The Petitioner has not demonstrated how trial counsels failure to object to the remarks of the prosecutor was anything other than a tactical decision. Indeed, Mr. Goodlett was not asked why he did not object to these particular comments. Moreover, the jury was properly instructed on its duty under the law. Accordingly, this Court concludes that trial counsel were not ineffective in this regard.

### 6. Comments on Investigation

The Petitioner next argues counsel were ineffective when they failed to object to the State's comments during closing argument at sentencing which he alleges "improperly vouched for its own investigation." The Petitioner cites two instances. The first was a comment regarding a scrub shirt containing blood stains the victim's daughter found in the victim's basement: "Weeks later, the daughter finds a shirt in the basement she thinks is important to bring forward as a family – as has been stated, a family of medical people and it happened to be a scrub shirt. It may have been a year old, it might have been ten years old, but she brought it forward and I'm glad she did and we checked into it. It didn't mean anything." During the evidentiary hearing, Mr. Goodlett was asked why he did not object to this comment. He responded: "The proof was that Ms. Jackson, as I recall, had been employed at that point by the hospital or a clinic and I just think it was sort of [de minimis] at that point." The Petitioner does not argue how Mr. Goodlett's decision was objectively unreasonable, especially in light of the fact that the Petitioner has not shown how that piece of evidence was relevant one way or the other. Accordingly, trial counsel cannot be deemed ineffective in that regard.

As to the second instance of alleged improper vouching, the Petitioner refers to the prosecutor's comments about the performance of law enforcement officers in this case: "These people worked hard. Tim Eads worked hard and Mike Bredlove worked hard. Your sheriff, Tom Wall worked hard to search for the truth." The Petitioner suggests that "[t]he unspoken message is that the prosecutor knows what the truth is and is assuring its revelation through witnesses for whom he vouches." In denying relief on this ground, the trial court stated:

[This] statement could hardly be construed as vouching for the work of law enforcement. At best, the statement was irrelevant to the issues to be tried and a possible appeal to emotion. The statement, made in passing, was innocuous and did not affect the decision of the jury.

The prohibition against vouching for elements of the case is generally limited to vouching for the credibility of a witness. *See State v. Henley*, 774 S.W.2d 908, 911 (Tenn. 1989). The work of law enforcement, i.e., the facts discovered by investigation, is a comment on the strength of the evidence.

With regard to the State vouching for its own investigation, the Tennessee Supreme Court has stated, "Expressions of personal opinion by the prosecutor are a form of unsworn, unchecked testimony and tend to exploit the influence of the prosecutor's office and undermine the objective detachment that should separate a lawyer from the cause being argued." [*Id.*] (citing *Lackey v. State*, 578 S.W.2d 101, 107 (Tenn. Crim. App. 1978)). Accordingly, comments by prosecutors vouching for the credibility of witnesses or, as in this case, the reliability of a police investigation[,] are improper. However, when taken in the context of the State's entire closing argument, this comment cannot be said to have prejudiced Petitioner.

The post-conviction court noted, however, that Mr. Goodlett was not questioned about his decision not to object, and further noted that the jury was properly instructed on the law regarding the arguments of counsel. The Petitioner has failed to demonstrate how the trial court's conclusion is erroneous. Given our review of the record, we cannot conclude that counsel were ineffective for failing to object to these comments.

### 7. Victim Impact Evidence

The Petitioner contends that the prosecutor solicited improper victim impact evidence from the victim's daughter during the guilt phase of the trial to which defense counsel should have objected. The trial testimony in question relates to the victim's appearance at a family wedding, the type of clothing and shoes the victim enjoyed wearing, and the victim's affinity for featherbeds. As to each challenged area of the victim's daughter's testimony, the trial court concluded that the testimony did not cause undue sympathy for the victim or prejudice the Petitioner. More importantly, though, the trial court noted that counsel was not asked during the evidentiary hearing why he did not object to that line of questioning. As noted above, decisions about whether to voice objections are left to the discretion of trial counsel and absent a showing the decision was made for a valid tactical reason, such as avoiding drawing undue attention to certain evidence, trial counsel's decision will not be questioned.

44

*See, e.g., Sexton,* 2007 WL 92352, at *5. Accordingly, the trial court did not err in denying relief on this ground.

Similarly, the Petitioner argues trial counsel should have objected to alleged improper comments about victim impact evidence made by the prosecutor during the closing argument at the guilt phase of the trial. The Petitioner contends the comments, which reference the victim's missed opportunities, the victim's daughter's description of the victim, and the simple nature of the victim's lifestyle, impermissibly encouraged the jury to convict based on passion instead of deliberation. Recognizing that victim impact evidence is irrelevant to the issue of guilt or innocence and thus should not be presented during the guilt phase of a capital trial, the trial court in this case concluded that the prosecutor's reference to such matters did not prejudice the Petitioner. We agree. The trial court noted the jury was properly instructed that it could not consider sympathy or prejudice during deliberation and that it was required to base its verdict solely on the evidence presented at trial. Our review of the record reveals that the comments about which the Petitioner now complains were not of such a degree, given the convicting evidence introduced at trial, that they deprived him of a fair trial or called into question the reliability of the outcome. The jury was clearly instructed that the State maintained the burden of proving each element of the offenses beyond a reasonable doubt. The jury was further instructed that the statements of counsel during argument were not to be considered evidence. The Petitioner is not entitled to relief on this ground.

### 8. Credibility of Defense Witness

Next, the Petitioner asserts that trial counsel should have objected to alleged improper comments the prosecutor made about Dr. Lisa Forman, the defense's DNA expert. During closing argument at the guilt phase, the prosecutor argued:

Use your common sense. Do you all know of any reason why somebody would cut the seat of their truck? What is that consistent with? Does that take a Rhodes scholar to figure that out? Why of course not. You know, I don't know about Dr. Forman. I got the impression that she thought she was smarter than the sum total of everybody in the courtroom, the jury, the judge and me included. That's my impression of her. Somebody that would volunteer to get involved in the O.J. Simpson case, I've got to have a little bit of question about them. And I don't know what you all think about the O.J. Simpson case, but whoever's involved in that I don't have much to do with them. And she volunteered to jump in that one.

That tells you a little bit it [sic] and frankly, she thinks most of our family trees don't fork around here. That's my impression, she kind of – you know, she kind of [thinks] that we're an inbred bunch and that, you know, we're not normal around here. I don't know, but assume that she's telling us, you know, just like it is, there's still human blood in the seat of this truck and it's cut out.

At trial, Dr. Forman disputed the State's expert's opinion that DNA testing ruled out the Petitioner as the source of the blood found on the passenger seat of his truck. Dr. Forman admitted, though, that she did not conduct an independent analysis but was only reviewing the findings of the State's expert.

The trial court found that some of the remarks quoted above were "over the top." The court otherwise concluded, however, that they were not so inflammatory as to have affected the verdict to the prejudice of the Petitioner. We agree. The Petitioner neglects to argue how counsel's failure to object to these statements resulted in any prejudice. As the trial court held, these few comments were not enough to cause the jury to become so prejudiced toward the Petitioner that they were more likely than not going to convict him regardless of the evidence introduced at trial. Moreover, the jury was properly instructed on its duty under the law, that is, arguments of counsel are not evidence and their verdict must be based solely on the evidence introduced at trial. The Petitioner is not entitled to relief on this ground.

### 9. Comments about Petitioner

During closing argument at the guilt phase, the prosecutor argued that "[This defendant did everything he could to get rid of the blood, but, you know, thank goodness, he's a sloppy, sloppy predator because he left a little bit [at] the scene and Shelley Betts found it just like she found that stripe on the top of the headrest." This statement immediately followed the prosecutor's comments about Dr. Forman and the blood stains found in the Petitioner's vehicle. The Petitioner argues that defense counsel should have objected to the prosecutor's characterization of him as a "sloppy, sloppy predator." The trial court denied relief on this claim of ineffective assistance of counsel:

The fact that Petitioner's acts were referred to as "sloppy" is a fair comment upon the evidence in this case. While the fact that Petitioner's methods were ineffective may not have been totally relevant, the comment is not prejudicial.

The reference to Petitioner as a "predator" is another matter. "It is improper for the prosecutor to use epithets to characterize a defendant." *State v. Thomas*, 158 S.W.3d 361, 414 (Tenn. 2005) (repeated references to defendants as "greed and evil"); *see also State v. Cauthern*, 967 S.W.2d 726, 737 (Tenn.

46

1998) ("evil one"); *State v. Bates*, 803 S.W.2d 881 (Tenn. 1991) ("rabid dog"); *State v. Gann*, 251 S.W.3d 446, 461-62 (Tenn. Crim. App. 2007) (likening defendant to a member of the Manson Family and calling defendant a "maniac" and a "raging homicidal killer"); *State v. Goltz*, 111 S.W.3d 1, 8 (Tenn. Crim. App. 2003) ("criminal" and "underhanded thief"). Although the State's comment was improper, the record reflects that the comment was an isolated one and, in light of the facts and circumstances of the case, more likely than not did not affect the outcome of the case, thus there is no prejudice to the Petitioner. Because any error the State may have committed in making the comment was harmless, trial counsel cannot be found to have been ineffective for not objecting to the comment.

This Court agrees. Even if the prosecutor's comment was improper, any deficiency by counsel's failure to object to that one isolated remark did not deprive the defendant of a fair trial or call into question the reliability of the outcome. *See Nichols*, 90 S.W.3d at 587. Accordingly, counsel was not constitutionally ineffective in this respect.

### 10. Aggravating Circumstances

During its opening argument at the sentencing phase, the prosecutor displayed for the jury, via the use of an overhead projector, the entire list of all of the statutory aggravating circumstances. Simultaneously, the prosecutor reminded the jury that the State was required to give notice on which of those aggravators it was relying, and he then proceeded to read to the jury the language of those three upon which the State was relying. The Petitioner argues that trial counsel should have objected to the display of the non-charged aggravating circumstances. Citing *State v. Blanton*, the trial court found any error by the prosecutor in this respect to have been harmless. As noted above, instructing the jury on inapplicable aggravating circumstances is error which may otherwise be deemed harmless. *See Blanton*, 975 S.W.2d at 281. Despite these actions by the prosecutor during the opening statements at sentencing, the jury was only instructed on those three aggravating circumstances relied upon by the State. The jury is presumed to have followed the court's instructions. The Petitioner has thus failed to demonstrate any resulting prejudice from counsel's failure to object to the prosecutor's conduct in this respect.

### 11. Consideration of Sympathy

Next, the Petitioner argues that counsel should have objected to the prosecutor's comments during closing at sentencing that sympathy and prejudice have no role in a criminal trial. The trial court concluded that counsel were not ineffective for failing to object to these comments because the "no sympathy" jury instruction has repeatedly been upheld

47

by our supreme court. *See, e.g., State v. Bigbee*, 885 S.W.2d 797, 814 (Tenn. 1994), *superceded by statute on unrelated grounds, as recognized in State v. Odom*, 137 S.W.3d 572, 580-81 (Tenn. 2004). The Petitioner has failed to show how this conclusion is erroneous. Accordingly, he is entitled to no relief on this claim.

### G. Jury Instructions

The Petitioner cites to numerous jury instructions given during both phases of the trial and now claims trial counsel were ineffective by failing to object to them.

#### 1. Guilt Phase

##### i. Instruction on First Degree Murder

The Petitioner contends counsel should have objected to the trial court's definition of the term "intentionally" when it instructed the jury on the elements of first degree murder. Specifically, the Petitioner argues that murder is an offense which requires that the culpable mental state accompany the result of the conduct rather than the nature of the conduct and thus an instruction which defined "intentionally" as related to the nature of the conduct as well as the result of the conduct was erroneous. The supreme court has concluded that the alleged error with respect to the instruction at issue is not constitutional in nature. *See State v. Faulkner*, 154 S.W.3d 48, 60 (Tenn. 2005) ("The entire charge on first degree premeditated murder eliminated any risk of the jury applying the wrong definition."). Accordingly, as the post-conviction court concluded, counsel cannot be deemed ineffective for failing to object to the charge.

##### ii. Instructions on Especially Aggravated and Aggravated Kidnapping

Similarly, the Petitioner contends counsel should have objected to the trial court's definition of "intentionally" with respect to its instructions on especially aggravated kidnapping and aggravated kidnapping. Because the Petitioner was not convicted of especially aggravated kidnapping, his contention with respect to the instruction on that offense is moot. With respect to the inclusion of both the nature of conduct and result of conduct language in the definition of "intentionally" in relation to the instruction on aggravated kidnapping, the trial court, citing the reasoning of the supreme court in *Faulkner*, concluded that any error in the instruction was harmless. We agree. *See State v. Mark Alton Mayfield*, No. E2007-01453-CCA-R3-CD, 2008 WL 4876568 at *5 (Tenn. Crim. App., Nov. 12, 2008), *perm. to app. denied,* (Tenn., Apr. 27, 2009). Thus, counsel cannot be deemed ineffective for failing to object.

48

### iii. Sequential Jury Instructions

The Petitioner contends counsel should have objected to the trial court's sequential jury instructions because they "unfairly skewed" the jury's deliberative process. As the trial court noted, our supreme court has held that sequential jury instructions do not deprive a defendant of his constitutional right to a jury trial. *See State v. Davis*, 266 S.W.3d 896, 905 (Tenn. 2008). Accordingly, counsel cannot be deemed ineffective for failing to challenge the jury charge in this respect.

### iv. Instruction on Flight

The Petitioner contends that trial counsel should have objected to the instruction on flight because the proof did not warrant such an instruction. In denying relief on this issue, the trial court cited the relevant law on the propriety of the instruction and offered the following statements about whether trial counsel were ineffective:

> "In order for a trial court to charge the jury on flight as an inference of guilt, there must be sufficient evidence to support such instruction." *State v. Berry*, 141 S.W.3d 549, 588 (Tenn. 2004). Sufficient evidence to support such an instruction requires "both a leaving the scene of the difficulty and a subsequent hiding out, evasion or concealment within the community." *State v, Burns*, 979 S.W.2d 276, 289-90 (Tenn. 1998) (quoting *State v. Payton*, 782 S.W.2d 490, 498 (Tenn. Crim. App. 1989)). "A flight instruction is not prohibited when there are multiple motives for flight. . . . A defendant's specific intent for fleeing a scene is a jury question." *State v. Berry*, 141 S.W.3d 549, 589 (Tenn. 2004) (appendix).
>
> In this case, the record reflects that Petitioner's mother, with whom Petitioner lived, did not see or hear from Petitioner between September 25 and October 8, 1995. When Petitioner telephoned his mother on October 8, he told her that he was in Knoxville, where he would be "laying low for a while" because some "creditors" were looking for him. About a week later, Petitioner returned to his mother's house. Although Petitioner returned to, and was ultimately arrested in, the area near where the victim was last seen alive, the appellate courts have upheld a flight instruction in situations in which a defendant fled the scene of the offense before returning to it. *See State v. Nesbit*, 978 S.W.2d 872, 900 (Tenn. 1998) (appendix). The flight instruction was appropriate given the facts of this case and, given that Mr. Goodlett was not asked about the flight instruction during the evidentiary hearing, this Court can only speculate as to why counsel did not object to the instruction being

49

given. This being the case, trial counsel were not shown to have been ineffective for not objecting to the instruction.

We agree with the trial court. Given our review of the evidence presented at trial, we conclude that counsel were not objectively unreasonable in failing to object to the flight instruction given to the jury.

### 2. Penalty Phase

### i. Unanimous Verdict Instruction

The Petitioner contends counsel should have objected to the trial court's instruction that a unanimous verdict was necessary in order for the jury to have imposed a life or life without the possibility of parole sentence. As the trial court noted, the pattern jury instruction given in this case has been approved by the supreme court. *See State v. Ivy*, 188 S.W.3d 132, 163 (Tenn. 2006). Accordingly, counsel cannot be deemed ineffective for failing to object.

### ii. Reasonable Doubt Instruction Regarding Aggravating Circumstances

Next, the Petitioner contends counsel should have objected to that portion of the instruction that "[i]t is not necessary that the aggravating circumstance or circumstances be proved beyond all possible doubt, as absolute certainty is not demanded by the law." Again, however, because language similar to that of the instruction used in this case has been approved by our supreme court, *see State v. Bush*, 942 S.W.2d 489, 521 (Tenn. 1997), trial counsel's failure to object to the instruction cannot be considered objectively unreasonable.

In addition to failing to object to certain instructions, the Petitioner also claims counsel should have requested other jury instructions during sentencing and argues that their failure to do so resulted in ineffective assistance.

### iii. Instruction on Consequence of Failure to Agree on Sentence

The Petitioner contends counsel should have requested an instruction explaining to the jury the consequence of their failure to agree on a penalty. The trial court correctly stated that a judge is not permitted to inform the jury about the effect of its failure to agree upon a sentence. *See* Tenn. Code Ann. § 39-13-204(h). Because this was the law at the time of the trial in this case, trial counsel's failure to request such an instruction was not deficient. For the same reason, the Petitioner's argument that counsel should have requested the trial court

50

to instruct the jury that their guilty verdict for first degree murder would not be affected if they could not agree upon a sentence must fail.

### iv. Instruction on Sympathy

The Petitioner also contends counsel should have requested an instruction stating that the jury could base its decision during sentencing on mercy, sympathy and compassion. Our supreme court, however, has consistently held that a defendant is not entitled to such an instruction. *See State v. Keen*, 926 S.W.2d 727, 739 (Tenn. 1994). Trial counsel thus were not ineffective for failing to request the instruction.

### v. Instruction on Victim Impact Evidence

Next, the Petitioner argues counsel should have requested the trial court to instruct the jury about how it should treat victim impact evidence. As the trial court recognized, the now-familiar jury instruction regarding victim evidence was not adopted by our supreme court until after the trial in this case. *See State v. Nesbit*, 978 S.W.2d 872, 892 (Tenn. 1998). Indeed, the supreme court in *Nesbit* stated that the approved "instruction should be used in substance in all future capital murder trials where victim impact evidence has been introduced and is effective from the date this decision is released." *Id.* Although the Petitioner relies upon *Nesbit* in support of his argument, we conclude that trial counsel were not objectively unreasonable in failing to request such an instruction in this case. Nevertheless, we agree with the trial court that the Petitioner was not prejudiced by counsel's failure to request such an instruction. The State did not introduce any victim impact evidence during sentencing. Moreover, the jury was specifically instructed that statements and arguments of counsel were not to be considered evidence and that it could not take into account any facts or circumstances other than those supporting the aggravating circumstances when deciding upon a sentence.

### vi. Instruction on Mutilation Aggravator

The Petitioner contends trial counsel were ineffective for failing to request an instruction clarifying to the jury what is meant by the phrase: "The defendant knowingly mutilated the body of the victim after death." Tenn. Code Ann. § 39-13-204(i)(13). The Petitioner argues that the instruction "fails to clarify agency." According to the Petitioner's argument, because there was evidence that animals gnawed on the corpse, "it was imperative for the jury to be instructed as to whether actions of scavengers could, or could not, be attributed to the defendant." The post-conviction court rejected this argument. According to the trial court:

51

The plain language of T.C.A. § 39-13-204(i)(13) required the perpetrator to have actively performed the act, not set in motion a series of circumstances which allowed the mutilation to occur. "Knowingly mutilated" requires the action to have been accomplished by the perpetrator. If the General Assembly had intended [to] include situations in which the actions of the perpetrator allowed mutilation to occur, the language of the statute would have included ". . . or allowed to be mutilated" or the like. The language is straightforward and clear and the jury would have [had] no difficulty in applying it as intended.

We agree. Based upon the plain language of this aggravating circumstance, trial counsel were not objectively unreasonable for failing to request an instruction such as that now suggested by the Petitioner. The Petitioner is not entitled to post-conviction relief in this instance.

### vii. Instructions on Mitigating Evidence

The Petitioner complains that counsel "successfully requested instructions on mitigation that were contradictory, confusing, inapplicable to the instant case, and were unsupported by the proof, and which opened the door to otherwise inadmissable evidence." As the Petitioner acknowledges, though, some of the requested instructions to which he refers in his brief were not actually given by the trial court. As to the others, he contends they were not supported by the proof. Examples cited by the Petitioner include instructions commenting on his history of addiction, his troubled upbringing, and his psychological and emotional health. Having reviewed the record, we cannot conclude that trial counsel's actions in requesting these instructions were deficient. *See State v. Cazes,* 875 S.W.2d 253, 267-68 (Tenn. 1997) (observing that overcharging on mitigating evidence generally benefits defendant). Nevertheless, the Petitioner has otherwise failed to demonstrate any resulting prejudice.

### H. Appeal

Lastly, the Petitioner argues that counsel rendered ineffective assistance on direct appeal for failing to include the following three issues in their appellate brief: 1) the aggravating circumstance, that the defendant knowingly mutilated the body of the victim after death, was unconstitutional on its face and as applied in this case; 2) Dr. Harlan's testimony concerning the time and circumstances of death was inherently unreliable; and 3) Dr. Harlan failed to preserve evidence to the Petitioner's prejudice. As the record reflects, counsel raised a total of nine issues on appeal to this Court challenging both his convictions and death sentence.

52

The same principles apply when reviewing courts evaluate the effectiveness of either trial or appellate counsel. *Campbell v. State,* 904 S.W.2d 594, 596 (Tenn. 1995). An appellate attorney, however, is neither duty bound nor required to raise every possible issue on appeal. *Carpenter v. State,* 126 S.W.3d 879, 887 (Tenn. 2004) (citing *King v. State,* 989 S.W.2d 319, 334 (Tenn. 1999); *Campbell,* 904 S.W.2d at 596–97)). The "failure to preserve and/or assert all arguable issues on appeal is not *per se* ineffective assistance of counsel, since the failure to do so may be a part of the counsel's strategy of defense." *State v. Swanson*, 680 S.W.2d 487, 491 (Tenn. Crim. App. 1984). Moreover, "[t]he determination of which issues to present on appeal is a matter of counsel's discretion." *Id.*

To show that counsel was deficient for failing to raise an issue on direct appeal, the reviewing courts will analyze the merits of the contested issue. *Carpenter,* 126 S.W.3d at 887 (citing *Kimmelman v. Morrison,* 477 U.S. 365, 375 (1986)).

> Obviously, if an issue has no merit or is weak, then appellate counsel's performance will not be deficient if counsel fails to raise it. Likewise, unless the omitted issue has some merit, the petitioner suffers no prejudice from appellate counsel's failure to raise the issue on appeal. When an omitted issue is without merit, the petitioner cannot prevail on an ineffective assistance of counsel claim.

*Id.* at 887-88. In fact, "[i]neffectiveness is very rarely found in cases where a defendant asserts that appellate counsel failed to raise an issue on direct appeal, primarily because the decision of what issues to raise is one of the most important strategic decisions to be made by appellate counsel." *Kennath Henderson v. State,* No. W2003-01545-CCA-R3-PD, 2005 WL 1541855 at *44 (Tenn. Crim. App., June 28, 2005), *perm. to app. denied* (Tenn., Dec. 5, 2005).

As to the first issue, the Petitioner's argument on appeal consists solely of the following sentence:

> Appellate counsel rendered ineffective assistance of counsel by failing to challenge the aggravating circumstance that the defendant knowingly mutilated the body of the victim after death as unconstitutional on its face and as applied in this case, especially given the failure to limit application of the aggravating circumstance to mutilation caused by human action and to specifically exclude consideration of mutilation caused by the activity of scavengers or the decomposition process.

The Petitioner does not offer any argument in support of this issue he claims counsel should have raised on appeal, and he does not cite to any legal authority in support thereof. Accordingly, the Court considers this post-conviction ground for relief to be waived on

appeal. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). Nevertheless, we agree with the trial court's conclusion that counsel were not ineffective for failing to raise the issue on direct appeal. The language of the aggravating circumstance at issue provides: "The defendant knowingly mutilated the body of the victim after death." Tenn. Code Ann. § 39-13-204(i)(13). In denying post-conviction relief, the trial court held:

> In the case *sub judice*, this Court believes that the term "mutilation" is a term which most reasonable people could understand without further instruction. As to Petitioner's assertion that the statute, as written, [would] be inapplicable in this case, this Court finds that reasonable jurors would interpret "knowingly mutilated" as requiring an affirmative act on part of the defendant rather than merely setting in motion a chain of events leading to the victim's mutilation. In other words, reasonable jurors would have understood that had they found that Petitioner left the deceased in such a state which allowed [her] body to be torn apart by wild animals after her death, such actions would not constitute "knowing mutilation" for purposes of the statute.

The Petitioner does not explain how this reasoning is flawed. Nor does he explain how this aggravating circumstance is unconstitutional other than by simply suggesting that it is. That mere suggestion, however, does not demonstrate how counsel's failure to raise the issue on appeal was objectively unreasonable. Regardless, given the sufficient evidence supporting the other two aggravating circumstances, the Petitioner cannot show prejudice.

As to the other two issues he claims counsel should have raised on appeal, this Court has already determined that counsel were not ineffective in their conduct during trial with respect thereto. Thus, counsel cannot be deemed ineffective for failing to raise those issues on appeal. The Petitioner has simply failed to demonstrate how he received the ineffective assistance of counsel during direct appeal.

II.    *Jury Selection*

In addition to those claims regarding trial counsels' representation during jury selection which are addressed above, the Petitioner contends that the trial court also committed numerous errors during voir dire. The trial court concluded that each alleged instance of error is either waived or previously determined. This Court agrees. *See* Tenn. Code Ann. § 40-30-106(g) and (h).

54

Because the Petitioner did not raise as issues on direct appeal any of the instances in which he now alleges the trial court erred, they must be considered waived. Neither of the two statutory exceptions with respect to waiver are applicable. *See id.* With respect to his contention that the trial court erred in denying additional peremptory challenges, the Petitioner acknowledges that the issue has been previously determined. *See* 121 S.W.3d 613, n.6. The Petitioner states that he only raises it now to preserve the issue for potential federal court review. Accordingly, for these reasons the Petitioner is not entitled to post-conviction relief on his claims regarding the trial court's conduct of jury selection.

III. *Counsels' Hotel Visit*

As discussed above, Mr. Goodlett admitted during the evidentiary hearing that he and Mr. Love visited the hotel while the jury was onsite in order to make sure the jurors did not have access to any newspaper boxes. The visit occurred Saturday evening, August 30, 1997, following the conclusion of the proof at the guilt phase. The trial judge was made aware of the incident soon after it happened, and on Monday, September 1, 1997, immediately following the return of the jury verdict, the judge admonished counsel, outside the presence of the jury, against any future visits to the hotel. The judge stated as follows:

> All right. Gentlemen, I've noticed this jury is a very conscientious jury and a very intelligent jury. I've given them an abundance of instructions on how to conduct themselves, them and the alternates, I see no reason to do it anymore.
>
> It has come to the Court's attention that there may be some investigation, somebody thought it might have been necessary [to go] around the hotel out there. Saturday night I put down an order and I'm telling you what the order is now. Anyone involved in this case that's anywhere around the motel, anywhere in the vicinity, and the vicinity could be from 20 feet to two miles, there is a standing order that you will be immediately arrested, placed in custody until I get to you. And I'm going to be dove hunting the rest of the day and it's going to be hard to find me. That's the judgment of this Court.

The Petitioner argues in post-conviction that the trial judge should have informed counsel they were seen at the hotel and that a police report was filed as a result of the incident. He also argues that the trial judge should have questioned the jury about the incident. The post-conviction court concluded, however, that although counsel's visit was unwise, the Petitioner was not ultimately prejudiced by the actions of counsel. We agree. As quoted above, the trial court properly admonished the jury throughout the trial process, and immediately before it retired that Saturday to begin deliberations, the court instructed the jury that it was to base its verdict solely on the proof introduced at trial. We have already

concluded that the Petitioner has failed to demonstrate that the jury was actually exposed to any extraneous prejudicial information or improper influence by counsel during their visit. Although counsel may have been seen by one or more jurors, their mere presence at the hotel, without direct proof of any contact or communication with any juror, did not render the Petitioner's trial fundamentally unfair or result in any due process violation. The trial court acted appropriately upon learning of the incident. This ground for relief is without merit.

IV.    *Brady*

The Petitioner contends the State withheld impeachment evidence concerning the TBI investigation of Dr. Harlan. According to the Petitioner, by the time Dr. Harlan performed the autopsy in this case, "the State had already dismissed [him] as state medical examiner, barred him from the TBI laboratory, and begun an investigation of Dr. Harlan which would ultimately result in the permanent revocation of his medical license" and thus "the State was aware of Dr. Harlan's incredibility as a medical professional, lack of integrity, and propensity to destroy and/or desecrate evidence." The Petitioner specifically refers to information related to three other autopsies Dr. Harlan performed in 1995 and 1997, one in which he misdiagnosed the cause of death and another in which he misidentified the victim.

The trial court allowed the Petitioner, without any objection from the State, to present evidence in support of this particular ground for post-conviction relief which came to light following the filing of the original and amended petitions. The trial court, however, did not specifically address the merits of the issue in its written order denying relief. Although the State now argues waiver on appeal, it is clear from the record that the trial court intended to allow the Petitioner to pursue this claim. Accordingly, despite the trial court's failure to address the matter, we are nevertheless required to conduct a purely *de novo* review to determine whether this evidence was material to the defense as the Petitioner argues it is. *See Cauthern v. State*, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004).

In *Brady v. Maryland*, the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). "Favorable" evidence is that which is deemed to be exculpatory in nature or that which could be used to impeach the State's witnesses. *Johnson v. State*, 38 S.W.3d 52, 55-56 (Tenn. 2001). The State's duty to disclose extends to all favorable information irrespective of whether the evidence is admissible at trial. *Id.* This duty, however, does not extend to information the defendant already possesses, or is able to obtain, or to information not in the possession of the prosecution or another governmental agency. *State v. Marshall*, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992).

In order to sustain a *Brady* claim, a defendant must establish the following:

1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information, whether requested or not);

2. The State must have suppressed the information;

3. The information must have been favorable to the accused; and

4. The information must have been material.

*State v. Edgin,* 902 S.W.2d 387, 389 (Tenn. 1995). Evidence is deemed material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

> [The] touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting *Bagley*, 473 U.S. at 678). Materiality requires a "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435. In deciding whether the evidence is material, the suppressed evidence must be "considered collectively, not item by item." *Id.* at 436.

The information at issue relates exclusively to the impeachment of Dr. Harlan's credibility. At the time of his trial testimony in this case, Dr. Harlan served as Assistant County Medical Examiner for Dickson County and Consulting Forensic Pathologist for Dickson County. In addition, he testified that he served as Assistant County Medical Examiner in 45 other counties and Consulting Forensic Pathologist in 63 other counties. Though he may no longer have been employed as the "state medical examiner," he still possessed his medical license at the time of trial and testified in the capacity of Assistant County Medical Examiner for Dickson County and Consulting Forensic Pathologist for Dickson County. Dr. Harlan's medical license was not revoked until 2005.

Mr. Goodlett apparently already knew something at the time of the trial about allegations concerning the competency of Dr. Harlan. He testified that he knew Dr. Harlan's "stock [was] at a low point" and that he, therefore, solicited information from other Public Defenders statewide about Dr. Harlan's "credentials." The Petitioner, however, neglected to ascertain the extent of Mr. Goodlett's knowledge. As noted above, the State is not required to disclose information the defendant already possesses or is able to obtain. *Marshall*, 845 S.W.2d at 233. The Court also has some reservations about the Petitioner's claim that the prosecution knew about or withheld information relating to the TBI investigation. Although General Alsobrooks testified at the evidentiary hearing, the Petitioner did not question him about his knowledge of the investigation into Dr. Harlan's practice. The Petitioner simply cites to a newspaper article which criticized Dr. Harlan's work in an unrelated case to suggest that the prosecutor was actually aware of any investigation at that time. Furthermore, although Agent Bredlove testified that he disagreed with Dr. Harlan's conclusion in a prior unrelated case, he did not testify that he was aware of any TBI investigation prior to the trial of this case. Neither of the other two TBI agents who testified at the evidentiary hearing were employed by the TBI at the time of the trial in this case, nor were they otherwise involved in the investigation in this case.

Nevertheless, the Court does not believe the information concerning the TBI investigation of Dr. Harlan "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id*. at 435. There is no doubt that Dr. Harlan's competency was eventually questioned and that his license to practice medicine was ultimately revoked. The issue at hand, however, is whether any additional impeachment evidence would have affected the outcome of the trial. As already discussed, defense counsel did, in fact, solicit expert testimony at trial to otherwise impeach Dr. Harlan's findings.

As recognized, this was a close case. The sufficiency of the convicting evidence, however, has been confirmed. Again, the supreme court acknowledged that the cause of the victim's death was undetermined. Nevertheless, the court held that the jury could have reasonably inferred premeditation from the totality of the evidence. The Petitioner does not contest the testimony of the other two medical experts who agreed that the victim's body exhibited signs of knife wounds. Nor does the Petitioner take issue with Dr. Marks' testimony which suggested that the victim's head could have been removed by a person after her death. In its analysis on the sufficiency of the evidence, the supreme court did not focus at all on Dr. Harlan's testimony but, instead, highlighted the Petitioner's "calculated behavior" and the statements he made to the police prior to his arrest, as well as the physical evidence collected, including blood stains consistent with the victim's blood which were found in the Petitioner's truck. Having reviewed the entire record in light of this additional impeachment evidence, we cannot conclude that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been

58

different." *Bagley*, 473 U.S. at 682. The Petitioner is not entitled to relief on his *Brady* claim.

## V.     *Dr. Harlan's Testimony*

The Petitioner argues that the trial court denied him a fair trial by allowing Dr. Harlan to testify, even though he may have lost or destroyed evidence, and by allowing Dr. Harlan to offer his opinion about the time of death. Because, however, the Petitioner did not raise this specific issue on direct appeal, it must now be considered waived. Tenn. Code Ann. § 40-30-106(g).

## VI.     *Cumulative Error*

The Petitioner requests this Court to consider the cumulative effect of the errors he has alleged above in deciding whether to grant him relief in this post-conviction appeal. Because we have found no single instance wherein trial counsel were deemed ineffective or wherein he was otherwise denied his constitutional right to a fair and impartial trial, there is no basis to conclude that any cumulative error resulted in an unfair trial. *See State v. Hester*, 324 S.W.3d 1, 76-77 (Tenn. 2010). Moreover, the sufficiency of the convicting evidence has previously been determined. Tenn. Code Ann. § 40-30-106(h).

## VII.     *Constitutionality of the Death Penalty*

The Petitioner raised a few issues on direct appeal challenging the imposition of the death penalty. *See* 121 S.W.3d 600. He now raises several additional issues about the constitutionality of Tennessee's death penalty statute and capital punishment in general. Because they were not raised on direct appeal, however, these issues are waived. Tenn. Code Ann. § 40-30-106(g). Regardless of waiver, the Petitioner would not otherwise be entitled to relief on any of them. *See, e.g, State v. Richard Taylor*, No. M2005-01941-CCA-R3-DD, 2008 WL 624913 at *41 (Tenn. Crim. App., Mar. 7, 2008) (recognizing no per se prohibition against execution of defendants suffering from mental illness); *Andrew Thomas v. State*, No. W2008-01941-CCA-R3-PD, 2011 WL 675936 at *42-45 (Tenn. Crim. App., Feb. 23, 2011), *perm. to app. denied* (Tenn. Aug, 25, 2011) (rejecting argument that Tennessee fails to ensure adequate counsel and resources in capital cases); *Hester*, 324 S.W.3d at 78-79 (holding that Tennessee's proportionality review is adequate); *Id.* at 79-80 (upholding Tennessee's lethal injection protocol); *Id.* at 80 (rejecting right to life claim).

**Conclusion**

For the foregoing reasons, this Court concludes that the post-conviction court properly denied post-conviction relief to the Petitioner. Accordingly, this Court affirms the judgment of the post-conviction court.

_____

JOHN EVERETT WILLIAMS, JUDGE